807 A.2d 872

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Karl CHAMBERS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 10, 2002.

Decided Sept. 26, 2002.

4

6

8

Ellen Burkowitz, Philadelphia, for Karl Chambers, appellant.

Amy Zapp, Harrisburg, for the Com. of PA, appellee.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

### OPINION

Justice NEWMAN.

Karl Chambers (Chambers) appeals from an Order of the Court of Common Pleas of York County (PCRA court) denying his Petition for Post–Conviction Relief pursuant to the Post Conviction Relief Act [1] (PCRA). For the reasons set forth herein, we reverse the PCRA court and remand the matter for proceedings consistent with this Opinion.

### FACTS AND PROCEDURAL HISTORY

The evidence submitted at trial, as summarized by this Court on direct review, established the following:

On Saturday, February 1, 1986, at or near 3:30 p.m., the victim, Anna Mae Morris, entered the C & M Variety store

---

1. 42 Pa.C.S. § 9541, *et seq.*

(hereinafter the "Fish Store") to purchase groceries with proceeds from her Social Security check which she had cashed the preceding day. The clerk filled her order and tallied her purchases. The victim then reached under her shirt for her wallet, tendered the amount due, put the change in her wallet, replaced her wallet under her shirt and left the store. At the same time, [Chambers] and a group of his friends were playing pinball and eating fish sandwiches in plain view of the victim. They had recently come from the home of Adam McKinney, a member of this group, where they had smoked some marijuana and drank some alcoholic beverages. These friends testified that [Chambers] neglected to place money into the common fund they collected for food purchases that day at the fish store and that moments after the victim departed, [Chambers] told his friends that he had something to do, adding he would meet them later in the evening at Adam McKinney's house. [Chambers] quickly left the fish store.

No one saw [Chambers], or the victim, until approximately 4:15 p.m. or 4:30 p.m. when Edgar Coder and Travis Wolfe stated that they saw [Chambers] and the victim on the Silver Bridge (so named because of its color). They were the last people to see the victim alive.

These witnesses testified that, although they could not hear what [Chambers] and the victim were saying to each other, they appeared to be arguing. In addition, Edgar Coder testified that [Chambers] had what appeared to be a large stick in one of his hands. Sometime between 4:45 p.m. and 5:00 p.m., another witness, Kevin Hartmen, while walking his dog there, noticed a body under the Maryland Pennsylvania Railroad Bridge (hereinafter the "Black Bridge" so named because of its painted color). (The Black Bridge is in close proximity to the Silver Bridge and both of these structures span the Codorus Creek.) Kevin Hartmen immediately contacted his friend, Donald Snell, who also saw the body. Mr. Snell approached his father about what he had seen. His father then told a retired policeman. In

turn, the retired policeman contacted the York Police Department and reported the body beneath the Black Bridge. The police arrived at the scene at 8:35 p.m. and began their investigation. The police found the victim's numerous articles of clothing, her torn open, empty wallet, along with her upper and lower dentures strewn around her lifeless, nude body. The autopsy revealed the victim was beaten to death by a blunt instrument and the cause of death was later determined to be a subdural hemorrhage or brain hemorrhage. [Reproduced Record (R.), at 590.]

While the police were investigating the murder scene, [Chambers], armed with an axe handle, went to a local bar called the Shady Dell. Before he was permitted to enter the bar, the manager, John Ettline, ordered [Chambers] to leave this club outside because Mr. Ettline did not want patrons carrying weapons into his establishment. [Chambers] complied and meandered through the Shady Dell for a time and left without re-claiming his stick. From there he proceeded to Adam McKinney's home. When he arrived at Adam's home, [Chambers] now possessed alcohol, marijuana, and money. [Chambers] did not tell his friends where he had been, what he had done, or where he [had] obtained the money to make his purchases, whereas a few hours before he did not have funds to contribute to their kitty.

Over the next few months, the police engaged in an exhaustive investigation. The questioning of witnesses revealed that [Chambers] often carried an axe handle, that he told his friends the police considered him a prime suspect, and that the police stopped [Chambers] as he was attempting to leave town. Debra Phillips, a woman who knew [Chambers], told the police she gave the axe handle to him because of a foot injury he received in an altercation with Debra's nephew some time before the murder. At that time, she suspected he could use the handle as a cane. Intense questioning of [Chambers'] acquaintances confirmed that on the day of the murder [Chambers] was seen carrying this axe handle. Their testimony also revealed that when he entered the fish store on the day of the murder, he had the

axe handle with him but the owners requested he leave it outside. When [Chambers'] friends left the fish store after [Chambers] had departed, they noticed that the stick was gone. And finally, they noted that [Chambers] did not have "his stick" when he rejoined them later in the evening at Adam's house.

On December 9, 1986, while [Chambers] was in the York County Prison on charges unrelated to this incident, he confided in two fellow prisoners, Jeffrey Hutchenson and Richard Taylor, and told them that he had killed the victim. [Chambers] said, "that when he asked the victim for her money and she refused, he hit her and took the money." The next day Jeffrey Hutchenson contacted his attorney, who notified the police. An arrest warrant was then issued on December 12, 1986, for [Chambers].

*Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 633–635 (1991) (*Chambers I*), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992).

On June 26, 1987, a jury convicted Chambers of one count of murder of the first degree [2] and one count of robbery.[3] Following a penalty hearing, the same jury found one aggravating circumstance, that the killing occurred during the commission of a robbery,[4] and one mitigating circumstance, that Chambers had no significant history of prior criminal offenses.[5] The jury concluded that the aggravating circumstance outweighed the mitigating circumstance and sentenced Chambers to death. On direct appeal, this Court affirmed the convictions for robbery and first-degree murder, but remanded the matter for a new penalty phase hearing because the prosecutor had referred to the Bible during the sentencing hearing. We concluded that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of a

**2.** 18 Pa.C.S. § 2502(a).

**3.** 18 Pa.C.S. § 3701.

**4.** 42 Pa.C.S. § 9711(d)(6).

**5.** 42 Pa.C.S. § 9711(e)(1).

penalty of death is reversible error *per se.*" *Chambers I* at 644.

At the second penalty phase hearing, conducted from May 16, 1994, until June 3, 1994, the jury found the same aggravating circumstance and two mitigating circumstances: (1) that Chambers had no significant history of prior criminal offenses (which the original jury had found); and (2) other evidence of mitigation, including family background, physical and mental abuse, neglect, survival needs, mental age, credibility of witnesses, behavior while in prison, and non-violent behavioral background.[6] The jury found that the aggravating circumstance outweighed the mitigating circumstances and imposed a sentence of death. On direct appeal, this Court affirmed the sentence of death. *Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96 (1996) (*Chambers II*), *cert. denied*, 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997).[7]

Chambers filed a timely Petition for Post Conviction Relief pursuant to the PCRA on November 10, 1997, and he submitted an amended Petition on April 21, 1998. His amended Petition raised numerous claims of ineffective assistance of trial counsel and contended that he was denied his constitutional right to due process because the Commonwealth failed to disclose material exculpatory evidence. By Opinion and Order dated March 8, 2000, the PCRA court denied Chambers' PCRA Petition, concluding that Chambers had not met the burden of proving, by a preponderance of the evidence, that his constitutional rights were violated or that trial counsel was ineffective.[8]

## DISCUSSION

On appeal to this Court, Chambers raises the following

---

**6.** 42 Pa.C.S. § 9711(e)(8).

**7.** Chambers was represented during trial, direct appeal, on remand for a new sentencing hearing, and on direct appeal of the second sentencing hearing by the same counsel, Thomas L. Kearney, III, Esq.

**8.** For the present appeal, Christina Swarns, Esq. and Ellen Berkowitz, Esq., who also represented him before the PCRA court, represent Chambers.

fourteen claims attacking his convictions and sentences: [9]

1. Is Chambers entitled to a new sentencing hearing because the community where he was tried was saturated with inflammatory, prejudicial publicity; did the PCRA court err in denying a hearing on this issue?

2. Is Chambers entitled to a new trial because the trial court's admission into evidence of an inflammatory photograph of the decedent's corpse violated Chambers' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution?

3. Is Chambers entitled to a new sentencing hearing because the instructions of the trial court prevented the jury from giving full effect to mitigating evidence?

4. Is Chambers entitled to a new trial and sentencing hearing because evidence of past bad acts and uncharged crimes was injected into his trial and sentencing?

5. Is Chambers entitled to a new trial and sentencing hearing because the jury was exposed to speculative and unreliable testimony about Chambers' "violent" character?

6. Is Chambers entitled to relief because the prosecutor's guilt and penalty phase closing arguments deprived Chambers of a fair and reliable capital sentencing proceeding?

7. Is Chambers entitled to relief from his conviction and sentence because the Commonwealth withheld crucial exculpatory evidence that someone other than Chambers committed the offense?

8. Is Chambers entitled to a new trial and sentencing hearing because counsel ineffectively failed to develop and present crucial medical health evidence, including evidence of organic brain damage?

9. Is Chambers entitled to a new trial and capital sentencing hearing because trial counsel ineffectively failed to secure testing and expert analysis of potentially exculpatory

**9.** We have renumbered Chambers' allegations of error for ease of discussion.

evidence; did the PCRA court err in denying a hearing on this issue?

10. Is Chambers entitled to relief from his death sentence because the sentencing hearing and the direct appeal that affirmed his death sentence were infected with constitutional error because: (a) the trial court failed to instruct the jury that "life imprisonment" means life without parole; (b) the proportionality review was flawed and violated due process; (c) the jury received written instructions, in violation of applicable law; (d) the jury was prevented from giving effect to mercy and sympathy; and (e) this Court failed to provide meaningful appellate review. This Court failed to correct these errors as part of its mandated review process in capital cases—errors resulting in violations of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 13 of the Pennsylvania Constitution?

11. Is Chambers' death sentence cruel and unusual punishment because Chambers is mentally retarded?

12. Is Chambers entitled to a new capital sentencing proceeding where trial counsel ineffectively offered opening and closing statements which instructed the sentencing jury not to consider the evidence of Chambers' violent and abusive childhood, and the sympathy arising from such evidence, as mitigating circumstances?

13. Were all prior counsel ineffective for failing to litigate the claims raised in this appeal?

14. Is Chambers entitled to relief from his conviction and sentence because of the cumulative effect of the errors described herein?

(Brief of Chambers at 2–3).

Section 9543(a) of the PCRA, which governs eligibility for post-conviction relief, provides in relevant part as follows:

(a) **General rule.**—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

(1) That the petitioner has been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted:

(i) currently serving a sentence of imprisonment, probation or parole for the crime;

(ii) awaiting execution of a sentence of death for the crime; or

(iii) serving a sentence which must expire before the person may commence serving the disputed sentence.

(2) That the conviction or sentence resulted from one of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

\* \* \*

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

\* \* \*

(3) That the allegation of error has not been previously litigated or waived.

(4) That the failure to litigate the issue prior to or during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel.

42 Pa.C.S. § 9543(a).

### Previously Litigated Claims

■ The Commonwealth contends that Chambers' first two allegations of error, inflammatory pre-trial publicity (claim 1)

and admission of crime scene photographs of the murder victim at the second penalty phase (claim 2), have been previously litigated. Section 9544(a)(2), 42 Pa.C.S. § 9544(a)(2), provides that an issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.]" This Court discussed and rejected both claims 1 and 2 on direct appeal. *Chambers II*, 685 A.2d at 103–105. Likewise, this Court rejected Chambers' claims that the trial court failed to instruct the jury that the sentence of life imprisonment means life without the possibility of parole (claim 10a) and that his sentence was not proportional to sentences rendered in similar cases (claim 10b). *Id.* at 106, 110. Accordingly, these issues are not appropriate for collateral review.

### *Claim 3—Jury Instructions on Aggravating and Mitigating Circumstances*

 Chambers argues that the instruction given to the jury by the trial court on aggravating and mitigating circumstances was flawed because it could have confused the jury and allowed the jurors to believe that they needed to unanimously find a mitigating circumstance before they could weigh aggravating and mitigating circumstances. Preliminarily, Chambers waived this claim because he failed to raise it on direct appeal. *See Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998). However, because Chambers has asserted a claim of ineffective assistance of counsel for failure to raise any and all of the issues presented in the instant PCRA Petition (claim 13), we will address the merits of his argument in light of the standard for ineffectiveness of counsel claims.[10]

10. Chambers was represented during trial, direct appeal, on remand for a new sentencing hearing, and on direct appeal of the second sentencing hearing by the same counsel, Thomas L. Kearney, III, Esq. Therefore, his first opportunity to challenge the ineffectiveness of Kearney was before the PCRA court, which he did. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687, 695, n. 6 (1977) (holding that "ineffectiveness of prior counsel must be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant").

It is well-settled that a claimant must show: "(1) that the [underlying] claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). Counsel will not be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649 (2001).

The trial court charged the jury as follows:

With regard to mitigating circumstances, however, you do not have to agree unanimously. Each one of you may find the mitigating circumstances that you find, but then if you find aggravating circumstances unanimously and you all find that there are certain mitigating circumstances or some of you find mitigating circumstances, **all of you must at least find one mitigating circumstance before you weigh.**

But then if all of you find the aggravating circumstance and **all of you find at least one or more mitigating circumstances,** then each one of you must determine whether the aggravating circumstance you find outweighs the mitigating circumstances.

There again regardless of the mitigating circumstances each one of you individually may find, **if you all find a mitigating circumstance, you must then weigh the aggravating against those mitigating circumstances** you find and must be convinced beyond a reasonable doubt as I have defined it for you that the aggravating circumstance outweighs the mitigating circumstances.

(N.T. 6/3/94 at 1523–1524) (emphasis added).

Chambers alleges that this instruction violates *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in which the United States Supreme Court struck down a jury charge where it found a "substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circum-

stance." *Id.* at 384, 108 S.Ct. 1860. The Court reasoned that "the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty is one we dare not risk." *Id.* In *Commonwealth v. Holland,* 556 Pa. 175, 727 A.2d 563 (1999), we held that:

> *Mills* does not require that the jury be affirmatively instructed that mitigating circumstances need not be unanimously found before any juror may weigh them. It only holds that where there is a high risk that instructions could be understood as requiring unanimity as to mitigating circumstances, the sentence must be vacated.

*Holland,* 727 A.2d at 568.

"When reviewing a challenge to a jury instruction, we must review the charge as a whole." *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1290 (2000); *see Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181 (1996). "An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law." *Spotz,* 759 A.2d at 1287. A trial court has broad discretion in phrasing its instructions and is permitted to choose its own wording. *Commonwealth v. Hawkins,* 549 Pa. 352, 701 A.2d 492 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998).

The concerns articulated in *Mills* and *Holland* are implicated in the present case. It is well settled that while a single juror in this Commonwealth can prevent a death sentence, a single juror can never compel a death sentence. *Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719, 725 (1993). Pursuant to 42 Pa.C.S. § 9711(c)(1)(iv), the jury may only impose a sentence of death if: (1) the jury unanimously finds at least one aggravating circumstance and no juror finds any mitigating circumstance; or (2) each juror finds that the aggravating circumstances found by the entire jury outweigh the mitigating circumstances found by that juror. In the

instant matter, parts of the above-quoted instruction are correct. The first sentence indicates that the jury does not have to find mitigating circumstances unanimously, which accurately reflects the law. The language further informs the jurors that they must find an aggravating circumstance unanimously to consider it, which is correct. However, the instruction, when read as a whole, seems to indicate to the jurors that, once they have unanimously found an aggravating circumstance, before they can weigh aggravating circumstances against any mitigating circumstances, they must **all** find the existence of at least one mitigating circumstance. This is not a correct articulation of the law and is the exact situation that *Mills* mandates we dare not risk. Therefore, the position of Chambers has arguable merit.

Chambers' original counsel, Thomas L. Kearney, III, Esq. (Attorney Kearney), filed an Affidavit attached to Chambers' PCRA Petition.[11] Therein Attorney Kearney stated that:

> Claim number three asserts that Mr. Chambers was denied a fair capital sentencing hearing because the trial court's instructions on aggravating and mitigating circumstances improperly precluded the jury from considering and giving full effect to mitigating evidence in violation of [*Mills*]. . . . I believe that this is a meritorious allegation of error. I had neither a strategic nor [a] tactical reason for failing to object to this improper instruction. This issue never occurred to me at trial.

Affidavit/Declaration of Thomas Kearney, Esq., dated August 3, 1998, Exhibit 1 to Appellant's Brief, page 3. Accordingly, Chambers has met his burden of proving the second prong of an ineffective assistance of counsel claim, namely, that counsel had no reasonable strategic basis for his inaction.

Next, we turn to the third prong of the ineffectiveness test: prejudice. "Prejudice is established when [a defendant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings." *Com-*

---

11. Kearney authenticated his affidavit during the PCRA hearing. (N.T. 8/23/99 at 13–14).

*monwealth v. Balodis,* 560 Pa. 567, 747 A.2d 341, 343–344 (2000). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326 (1999), we held that a "criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 331.

Clearly, Chambers suffered prejudice because the instruction could easily have confused the jury into believing that all members of the panel had to find a mitigating circumstance before weighing the aggravating and mitigating circumstances. The jury reasonably could have believed from the instruction given that it had to sentence Chambers to death unless each and every member of the panel found at least one mitigating circumstance. This possible and reasonable confusion could have meant the difference between life imprisonment and a sentence of death, rendering the sentence fundamentally unreliable.

Therefore, previous counsel was ineffective for failing to raise this issue during the penalty phase and the PCRA court erred in rejecting this claim. Consequently, we vacate the Judgment of Sentence and remand this matter to the Court of Common Pleas of York County for re-sentencing. This determination renders Chambers' claims relating to the penalty phase moot and, thus, we will not discuss those issues. However, as this conclusion does not implicate Chambers' guilt, we will now address Chambers' claims of error arising from the ineffective assistance of counsel during the guilt phase.[12]

### *Claim 4—Prior Bad Acts*

Chambers next avers that the trial court erred because it permitted the Commonwealth to introduce irrele-

---

12. Therefore, we will not discuss any part of claims 10c, 10d, 10e, 11, and 12. We will not discuss the penalty phase issues of claims 4 through 9.

vant and prejudicial evidence indicating that Chambers had committed prior unrelated crimes. Specifically, the court admitted evidence that Chambers: (1) had participated in a robbery; (2) had engaged in sex for money; and (3) had been incarcerated in the York County Prison on unrelated offenses. As the Commonwealth notes, this claim is waived because Chambers failed to object to the introduction of this evidence at any stage of the trial. However, as above, we will review the alleged error to determine if prior counsel was ineffective for having failed to raise it.

The Commonwealth contends that in each instance the trial court properly admitted the evidence. The Commonwealth charged Chambers in the instant case with both robbery and murder and the Commonwealth proceeded on a theory that Chambers' financial situation—he was consistently unemployed and without any source of income—served as the motive for the robbery in the present case and the earlier robbery. Likewise, the Commonwealth asserts that the fact that Chambers prostituted himself was relevant to establish Chambers' motive to acquire money. The Commonwealth maintains that evidence of Chambers' incarceration in the York County Prison served as the foundation for two jailhouse confessions that Chambers made to his cellmates and, therefore, evidence of his incarceration is relevant.

Evidence of the incarceration of Chambers was relevant to establish his presence at the York County Prison at the time he allegedly confessed to the crime and, therefore, was admissible. The admission of evidence of Chambers' prior robbery and prostitution, however, is more troubling. Pennsylvania Rule of Evidence 404(b)(2) provides that "[e]vidence of other crimes, wrongs, or acts may be admitted . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident[,]" provided that the probative value of the proffered evidence outweighs any potential prejudice. The Commonwealth attempts to classify this evidence as proof of Chambers' motive to rob Anna Mae Morris (Morris). The connection seems tenuous. Chambers may have been motivated to commit the prior

robbery and prostitute himself in order to "remedy" his then financial situation. He may also have committed the robbery of Morris to remedy his current financial situation. However, the Commonwealth is not using the fact of the existence of the prior robbery or Chambers' prostitution as the motive for the robbery of Morris. The alleged motive is Chambers' financial situation, not his commission of these prior bad acts. Accordingly, Chambers' claim has arguable merit. Even if a claim of ineffective assistance of counsel has underlying merit, a defendant must still prove that counsel's deficient performance caused him prejudice.

The facts of this case establish Chambers' guilt in the murder of Morris. At approximately 4:15 p.m. or 4:30 p.m. on the day of the Morris' death, Edgar Coder (Coder) and Travis Wolfe (Wolfe) stated that they saw Chambers and Morris on the Silver Bridge. Although they could not hear what Chambers and Morris were saying to each other, they appeared to be arguing. In addition, Coder testified that Chambers had what appeared to be a large stick in one of his hands. Sometime between 4:45 p.m. and 5:00 p.m., another witness, Kevin Hartmen (Hartmen), while walking his dog, noticed a body, that of Morris, under the Maryland–Pennsylvania Railroad Bridge. The autopsy revealed the victim was beaten to death by a blunt instrument and the cause of death was later determined to be a subdural hemorrhage or brain hemorrhage.

While the police were investigating the murder scene, Chambers, armed with an axe handle, went to a local bar called the Shady Dell. Before he was permitted to enter the bar, the manager, John Ettline (Ettline), ordered Chambers to leave this club outside because Ettline did not want patrons carrying weapons into his establishment. Over the next few months, the police engaged in an exhaustive investigation. The questioning of witnesses revealed that Chambers often carried an axe handle, that he told his friends the police considered him a prime suspect, and that the police stopped Chambers as he was attempting to leave town. Debra Phillips, a woman who knew Chambers, told the police she gave

him the axe handle because of a foot injury he received in an altercation with Debra's nephew some time before the murder. Intense questioning of acquaintances of Chambers confirmed that on the day of the murder Chambers was seen carrying this axe handle.

Dr. Robert Silverman, the pathologist who performed the autopsy on Morris, testified that not only were the injuries sustained by Morris generally consistent with blunt trauma inflicted by a weapon such as an the axe handle of Chambers, but also that certain of the wounds found on Morris matched the pattern of curves seen on the axe handle and that other wounds were compatible with a screw on a clamp attached to the weapon. Roy Phillips (Phillips), a friend of Chambers, testified that a week or two after the murder, Chambers approached him and said, "Do you know I killed that old lady?" April Wright, the girlfriend of Phillips, confirmed that Chambers had made such a statement to Phillips.

While he was awaiting trial in the death of Morris, Chambers was in the York County Prison on charges unrelated to this incident. He confided in two fellow prisoners, Jeffrey Hutchenson (Hutchenson) and Richard Taylor (Taylor), and told them that he had killed Morris. Chambers told them that when he asked the victim for her money and she refused, he hit her with the axe handle and took the money. The next day Hutchenson contacted his attorney, who notified the police. The police recovered the axe handle. *In toto,* this evidence established: (1) that Chambers and Morris were seen arguing by two objective witnesses; (2) that at that time Chambers possessed the axe handle; (3) that within, at most, forty-five minutes, Hartmen discovered Morris' body; (4) that Chambers confessed to Hutchenson and Taylor; and, (5) that the police recovered the axe handle.

Chambers has not suffered any prejudice as a result of counsel's failure to object to the admission of this evidence because Chambers was not deprived of a fundamentally fair and reliable adjudication of his guilt. *Kimball, supra; see Commonwealth v. Peterkin,* 538 Pa. 455, 649 A.2d 121 (1994), *cert. denied,* 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821

(1995) (defendant did not receive ineffective assistance of counsel when his attorney failed to object to prosecution's closing argument request that jury be as cold and ruthless as defendant was when he walked up to the victims and pumped fifteen bullets into one body and nine into another because any prejudice from the remark was outweighed by the totality of the evidence of his guilt). All of the evidence referring to that Chambers had engaged in prostitution and most of the evidence that he had participated in a robbery unrelated to the murder of Morris, was offered only during the penalty phase and, therefore, had no bearing on the jury's determination of Chambers' guilt. The only guilt phase testimony cited by Chambers regarding the robbery was given by the robbery victim on re-direct examination by the prosecutor, after he had previously stated that Chambers had nothing to do with the robbery. The assertion of the robbery victim that Chambers was somehow involved does not comport with the testimony of either Vince Raineri or Aaron Heiner, the two individually who admitted to having jointly robbed Coder. Accordingly, Chambers has failed to demonstrate ineffective assistance of counsel that would warrant relief.

### Claim 5—Violent Character Testimony

Chambers next claims that he was denied a fair trial because the trial court permitted speculative and unreliable evidence indicating that various witnesses believed that Chambers was a violent person or could behave in a violent manner. Specifically, Chambers complains of the following testimony elicited from Coder:

Prosecutor: Were you scared when you talked to the police?

Coder: Yes.

Prosecutor: What did you think would happen to you since you saw Chambers and the victim together?

\* \* \*

Coder: They—he might try to get some of his friends or something to jump me.

(N.T. 6/24/87 at 755–756). He also cites to the following statement of Hutchenson:

Hutchenson: [Chambers] was just upset and everything. He just thought he could trust us, I guess, and just leave it go. So I stood up against the wall because he was getting, you know, that nervous that [sic] I thought he was going to do something.

(N.T. 6/25/87 at 864). As Chambers did not object at trial and did not present this claim on direct appeal, it is waived except to the extent that Chambers alleges ineffectiveness of prior counsel for having failed to raise it.

Chambers contends that these statements were highly prejudicial because both witnesses were permitted to offer their opinions on the dangerousness of Chambers, even though neither had any personal experience or expertise to make such an assessment. However, this contention is specious, as Chambers has taken these comments completely out of the context in which they were introduced. Coder's above-quoted testimony was elicited on re-direct examination after counsel for Chambers had sought to show that the statement that Coder gave to the police was inconsistent with his trial testimony. The above-quoted testimony was introduced to rehabilitate Coder by demonstrating to the jury that Coder was nervous at the time he spoke to the police. Likewise, the testimony of Hutchenson was merely a description of the events and the reaction Hutchenson had to them. Accordingly, this claim is without merit and counsel will not be deemed ineffective for failing to raise a meritless claim.

### Claim 6—Prosecution's Closing Argument

The next argument Chambers sets forth is that the prosecution's closing arguments in the guilt phase impermissibly vouched for witnesses, introduced "extra-recorded evidence," and incorrectly instructed the jury on the law. This claim is also waived because prior counsel did not raise it during trial or on direct appeal. Chambers cites to myriad statements during closing argument that he alleges constitute impermissible statements. However, having reviewed the

prosecutor's closing argument in the guilt phase, it is clear that the contentions of Chambers in this regard are wholly without merit. The Record reveals that the prosecution did not impermissibly vouch for witnesses, did not introduce "extra-recorded evidence," and did not incorrectly instruct the jury on the law. Accordingly, this contention deserves no further consideration.

### Claim 7—Disclosure of Exculpatory Evidence

Chambers alleges that the Commonwealth violated his due process rights by failing to disclose evidence that someone other than Chambers had killed Morris. Specifically, on September 5, 1986, Wendell Murray (Murray), an inmate at the York County Prison, told one Detective Follmer that he believed that a man named "Magic" had killed Morris. Detective Follmer's report of this interaction provided:

[Murray] related that on a night in February of this year, which he believes to be a Friday night-Saturday morning ... there was a sudden knock at the door and this Puerto Rican known as Magic entered and appeared to be seriously upset. [Murray] described him as being heavy, perspired and being nervous, and asked to be let in several times. [Murray] related that he was carrying a woman's pocketbook. As soon as he entered the apartment he started to go through the pocketbook.... [Murray] explained that he observed a lot of papers and he recalls seeing a plastic identification card with a photo on it. He believed this card to be a Welfare Card. He did not recall any names.... Because of the way the Puerto Rican was acting, [Murray] asked him what this was all about and at that time the Puerto Rican stated, I didn't mean to knock the old lady down and that old lady just wouldn't leave the pocketbook go, and went on to say, "She didn't have nothing but $2.00 and some change." [Murray] reported that he asked for more information and that the Puerto Rican said, "Please don't ever say anything about this pocketbook."

Exhibit 2 to Appellant's Brief, pages 1–2.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the U.S. Supreme Court held that "the

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. For a defendant to establish a *Brady* violation, he or she must show that: (1) the evidence was suppressed by the State, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *See also United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

In the case *sub judice,* the Commonwealth suppressed the report prepared by Detective Follmer by virtue of the fact that it did not give this document to Chambers' counsel during the trial; therefore, Chambers has met the first prong of the *Strickler* test. However, Chambers has failed to demonstrate that the evidence was favorable to him. Evidence is "favorable to the accused" where, "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. After Detective Follmer interviewed Murray, the police discovered that "Magic" was named Ricardo Valentine (Valentine), whom police had arrested on February 6, 1986, for driving a stolen vehicle. Police searched Valentine and found on his person various items that belonged to a woman named Diane Myers (Myers). Myers had reported her pocketbook stolen the preceding day. The police concluded that the information furnished by Murray was evidence of the theft of

Myers' pocketbook. The police deduced that Murray's statement to Detective Follmer was in no way connected with the robbery and death of Morris and they made no further use of this information in their prosecution of Chambers.

The evidence of record supports the conclusion of the PCRA court that the statement of Murray was not material. At an evidentiary hearing, Murray conceded the following: (1) he did not learn of the murder of Morris until his incarceration, several months after the murder occurred; (2) he determined that his encounter with Valentine must have occurred on the same weekend as the Morris murder, not because he actually remembered that that was the case, but because of the similarity of the circumstances; (3) he had an extensive record of *crimen falsi* convictions; (4) he was then awaiting trial and had informed the District Attorney that "if he could do something for me [in terms of sentencing,] I [could] give him some information concerning the death of the lady [who] was found under the bridge" (N.T. 6/30/99 at 42); and (5) despite his willingness to name others who had been present with him and Valentine, and his motive for convincing the District Attorney of his credibility, he neglected to inform the District Attorney of the presence of another individual whom the police could presumably have located without difficulty, as she was a police informant who had testified for the Commonwealth on numerous occasions. In light of the questionable nature of the recollections of Murray, the characterization of the PCRA court of his statement as simply an irrelevant and fruitless lead appears accurate, as does its observation that Murray, if called as a witness, would have appeared incredible. Thus, Chambers has failed to establish that he suffered any prejudice as a result of counsel's failure to present this evidence. Accordingly, his *Brady* claim cannot succeed. *See Commonwealth v. Paddy*, 800 A.2d 294, 2002 WL 1455595, *6 (Pa.2002) (prejudice is an essential component of an actionable *Brady* violation).

### Claim 8—Mental Health Evidence

Chambers next alleges that prior counsel was ineffective for failing to present evidence of organic brain damage to

the guilt phase jury. To support this argument, Chambers introduced a report by Dr. Patricia Flemings (Dr. Flemings), a psychologist who examined Chambers in March of 1998. Dr. Flemings found that Chambers had suffered head trauma, which would cause organic brain damage. During the guilt phase, Chambers staunchly maintained his innocence. The presentation of evidence of his mental health problems would have militated against that stance, so counsel had a reasonable basis for not presenting this evidence. Evidence of Chambers' mental health problems would likely have been more relevant during the penalty phase, but we do not discuss that issue because we have already determined that Chambers is entitled to a new penalty phase. Accordingly, trial counsel was not ineffective for failing to present evidence of Chambers' organic brain damage to the guilt phase jury.

### Claim 9—Testing of Physical Evidence

Chambers avers that his trial counsel was ineffective for failing to arrange for testing of physical evidence obtained from the crime scene, specifically, blood found on a stone, in two samples of snow, on a pair of pantyhose, on a sock, and on a sapling stick. He also contends that the PCRA court erred in refusing to permit him to arrange for forensic testing of those items. Before the PCRA court, Chambers requested discovery of this evidence pursuant to Pennsylvania Rule of Criminal Procedure 902(e)(2), which provides that "[o]n the first counseled [PCRA] petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." [13] We have indicated that a showing of good cause requires more than just a generic demand for potentially exculpatory evidence, especially in circumstances where the evidence was available previously. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 90–91 (1998), *cert. denied*, 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999) (*habeas corpus* relief granted on other grounds).

13. Prior to April 1, 2001, this provision was contained in Pennsylvania Rule of Criminal Procedure 1502(e)(2); the text of the Rule did not change.

■ "We review the denial of a discovery request in post-conviction proceedings for an abuse of discretion." *Common-wealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 591 (2000). The PCRA court rejected Chambers' request because Chambers failed to show good cause why the discovery should be permitted. Chambers failed to explain why trial counsel had not previously undertaken to request this discovery. Likewise, Chambers' allegation that trial counsel was ineffective for failing to request this discovery cannot succeed. Chambers failed to question his trial counsel at the PCRA hearing to determine why counsel did not seek blood testing of both Chambers and Morris at the time of the original trial and trial counsel did not explain his inaction in the Affidavit that Chambers submitted to the PCRA court. Exhibit 1 to Brief of Chambers. Chambers has failed to prove that his trial counsel did not have a reasonable strategic basis for not seeking blood testing. Accordingly, Chambers has failed to meet the second prong of an ineffective assistance of counsel claim. *Kimball,* 724 A.2d at 333.

### *Claim 14—Cumulative Error*

■ The final argument of Chambers is that the cumulative effect of the errors alleged herein denied him a fair trail. As we are remanding this case for a new penalty phase, we will address this contention only as it relates to the guilt phase. We have held that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992). Because we have determined that there were no errors during the guilt phase warranting relief, Chambers' allegation of cumulative error fails.

### CONCLUSION

We affirm the decision of the PCRA court as it relates to Chambers' claims arising from the guilt phase of his original trial. However, because we have determined that the trial court improperly instructed the jury on the weight and existence of mitigating circumstances during Chambers' penalty

phase hearing, we vacate the Judgment of Sentence and remand this matter to the Court of Common Pleas of York County for re-sentencing.

Justices CASTILLE and NIGRO concur in the result.