J-S66010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT |
| Appellee | OF PENNSYLVANIA |
| v. | |
| BREON POWELL, | |
| Appellant | No. 1524 EDA 2019 |

Appeal from the PCRA Order April 26, 2019
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0003591-2012

BEFORE:  STABILE, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.                    **FILED APRIL 29, 2020**

Appellant, Breon Powell, who is serving a sentence of life imprisonment for first-degree murder,[1] appeals from an order denying him relief under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-46.  We affirm.

On December 28, 2011, Appellant, along with co-conspirators Jermaine Jackson, Kazir Gist, Danasia Bakr and Tatyana Henderson, drove from Trenton, New Jersey to Levittown, Bucks County to rob Danny DeGennaro of money Jackson believed DeGennaro owed him.  Jackson, the ringleader, assigned each participant's role in the crime: Bakr was the get-away driver; Henderson was the lookout; and Appellant and Gist were to enter DeGennaro's house with Jackson and hold DeGennaro up at gunpoint.

---

[1] 18 Pa.C.S.A. § 2502.

When the co-conspirators arrived in Levittown, Jackson directed Bakr to drive to the back of DeGennaro's house, where he saw a car for sale. Spotting a phone number on the sign, Jackson told Henderson to call the number, thinking it belonged to DeGennaro. The number in fact belonged to DeGennaro's neighbor, Nick Wilson, who parked the car on DeGennaro's property for better visibility. Wilson answered, and Henderson feigned interest in buying the car and asked Wilson to come outside to let her test drive it. Wilson said it was too late at night and that she should come back tomorrow.

Before entering DeGennaro's house, Jackson reminded Appellant and Gist that their role was to ensure Jackson got his money, and that if DeGennaro refused, Appellant and Gist would hold him at gunpoint. As Appellant, Jackson, and Gist made their way toward DeGennaro's house, Jackson called Henderson on her cellphone. Henderson first heard dead air, and Jackson then said "Go ahead." Henderson hung up.

A few minutes later, Henderson and Bakr heard one loud gunshot then a quieter shot. Bakr realized that something had happened and started to drive away, but Appellant and Gist stopped them before they left and got in the car. Appellant and Gist both wore gloves, and Gist had a stocking pulled over his face. Appellant was "freaking out" and yelling at Bakr to get him out of Pennsylvania. Appellant said to Gist, "I had to do it. I had to do it. He was

charging at me, coming for me." Gist responded, "I shot him too," and complained that he had a burn on his hand.

Appellant and the others met up with Jackson back in Trenton later that night. Jackson yelled at Appellant, asking, "Why did you do it? Why did you shoot him? That man didn't deserve that. You could have just knocked him out. He looked like he was drunk." Appellant responded that he had to do it, and he exited Bakr's car and removed his bag from Bakr's trunk. He removed a shotgun from his pant leg, "shortened it" by breaking it down, placed the gun inside the bag and walked away.

An autopsy revealed that DeGennaro was killed by a shotgun wound to the chest that damaged his ribs, heart, lung, diaphragm and liver. Eighty-six shotgun pellets were recovered from his body for ballistics testing. The spacing of pellets and the markings by his wound indicated that the shot was from approximately three feet away. Ballistics evidence recovered from his house demonstrated that the murder weapon was a .12 gauge caliber shotgun.

During the police investigation, Bristol Township Detective Gregory Beidler learned that the neighbor, Wilson, received a call around the time of the murder regarding his car for sale. Through phone records, police identified the caller as Henderson and placed her near DeGennaro's home at the time of the murder. Henderson's phone records linked her to Bakr and likewise placed Bakr near the crime scene around the time of the murder. After obtaining a

search warrant for the content of Bakr's text messages for December 28 and 29, 2011, police found messages between Henderson and Bakr referencing "Jermaine," whom they determined was Jackson through phone records. The police requested a subpoena (but not a search warrant) for a phone number that called Jackson's phone four times on the night of the murder.

On February 13, 2012, the police obtained an order approving a hardwire for the cell phones belonging to Bakr and Jackson. On February 15, 2012, the Commonwealth intercepted a call from Jackson's phone to the Ready, Aim, Fire ("RAF"), an indoor shooting range and gun dealer in Bristol Township. That evening, Detective Jack Slattery posed as an employee behind the counter in the showroom. Detective Beidler and Detective Tim Perkins stayed in a car in RAF's parking lot as backup for Detective Slattery. Detective Slattery saw Jackson, Appellant, Gist, and Devon Clark enter the RAF showroom together, supply identification to the staff, and complete liability forms together. The four men huddled around two targets that both had holes, and Appellant used a phone while standing in the showroom. All four departed together in a Chevy Lumina.

On February 28 and March 1, 2012, Detective Beidler spoke several times with Henderson by calling her phone. On March 2, 2012, Detective Beidler and Detective Perkins interviewed Henderson. On the same day, after interviewing Henderson, the detectives interviewed Bakr's mother. On March 6, 2012, the two detectives accompanied Falls Township Police in arresting

- 4 -

Henderson for a retail theft charge. On March 8, 2012, Bakr gave a statement to Detective Beidler, and that evening Bakr wore a consensual body wire and met with Jackson. On March 12, 2012, Bakr was charged with criminal homicide, conspiracy, robbery, and burglary.

On March 12, 2012, the police received records for the number that called Jackson four times on the night of the murder. The records showed that Appellant was the account holder for this number.

Through these phone records and surveillance, police connected Henderson, Bakr, Jackson, Gist and Appellant. The records showed numerous calls and texts between Jackson and each co-conspirator in the hours leading up to DeGennaro's murder, and after. Cell tower information for each of the five revealed them traveling from Trenton to Levittown, where the murder occurred, and back to Trenton on December 28, 2011, and showed that all were in the area of the murder around the time of the murder.

On March 29, 2012, the police executed search warrants and recovered a .9 mm semi–automatic handgun in Gist's home and a black gym bag containing two .12 gauge shotgun rounds in Appellant's home. Police recovered a .357 caliber revolver inside Appellant's closet and a Trentonian newspaper opened to the article on Bakr's arrest.

At trial, Appellant interposed an alibi defense, contending that he had been at work at Ready-Pac Produce in New Jersey during the murder. The testimony of Bakr and Henderson, as well as the call records showing

Appellant exchanging calls with Jackson around the time of murder via cell towers near DeGennaro's residence, contradicted this claim. Appellant's cellphone did not acquire the cell tower near Ready-Pac again until 10:53 p.m., almost an hour after the murder.

On October 7, 2013, jury found Appellant guilty of first degree murder, robbery, conspiracy to commit robbery, burglary, conspiracy to commit burglary, and possession of an instrument of crime. He was sentenced to life imprisonment. On April 3, 2014, Appellant filed a timely notice of appeal to this Court. On direct appeal, this Court affirmed his judgment of sentence in a published opinion. *Commonwealth v. Powell*, 171 A.3d 294 (Pa. Super. 2017). On April 3, 2018, our Supreme Court denied Appellant's petition for allowance of appeal. Appellant did not appeal to the United States Supreme Court.

On September 21, 2018, Appellant filed a timely PCRA petition. Subsequently, through counsel, Appellant filed an amended PCRA petition alleging ineffective assistance of counsel. On April 26, 2019, following an evidentiary hearing, the PCRA court denied Appellant's petition. Appellant filed a timely appeal to this Court, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Appellant raises two issues in this appeal:

1. Did the Trial Court err in denying [Appellant]'s [PCRA] Petition as to the challenge to the effectiveness of Trial Counsel[?] Specifically, Trial Counsel Robin Lord was ineffective for failing to properly conduct the cross-examination of a trial witness so as to

maintain the Court's pre-trial Order that precluded the introduction of Prior Bad Acts Testimony by that witness. Trial Counsel Lord's cross-examination was overly aggressive and opened the door for the introduction of extremely damaging testimony against [Appellant] despite the Trial Court's repeated warnings that the cross-examination was going to lead to such evidence becoming admissible where it had not been previously permitted. The preclusion of such evidence was anticipated by counsel to be prejudicial and Trial Counsel acted unreasonably by ignoring the warnings given to her by the Court during her cross-examination of [] Henderson to the detriment of [Appellant]'s legal position.

2. Did the Trial Court err in failing to find that [Appellant]'s phone was tracked without the use of a warrant[?] Specifically, whether the searching of historical cell site data requires a warrant under the Fourth Amendment to the United States Constitution and under Art. I, § 8 of the Pennsylvania Constitution. [Appellant]'s location at diverse times was unlawfully tracked by law enforcement without a warrant and the tracking information was then used by law enforcement for further investigation. This statement of error asks whether, under the "fruit of the poisonous tree" doctrine, any and all information gained without a warrant should be deemed inadmissible and a new trial granted in this matter that excludes the use of such evidence against [Appellant.]

Appellant's Brief at 6-7.

To obtain relief under the PCRA, the petitioner must plead and prove:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.

(iv) The improper obstruction by government officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) Deleted.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

42 Pa.C.S.A. § 9543(a)(2).

In his first issue, Appellant argues that trial counsel was ineffective for opening the door for Henderson's testimony that Appellant participated in a previous robbery with Henderson, Bakr and Jackson. No relief is due because Appellant cannot demonstrate prejudice.

We presume counsel's effectiveness, and Appellant bears the burden of proving otherwise. *Commonwealth v. Urwin*, 219 A.3d 167, 172 (Pa. Super. 2019). To establish ineffectiveness of counsel, a PCRA petitioner must plead and prove: (1) his underlying legal claim has arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) counsel's actions prejudiced him. *Id.* Failure to satisfy any of these three prongs requires dismissal of the claim. *Id.*

A PCRA petitioner establishes prejudice by demonstrating that "counsel's chosen course of action had an adverse effect on the outcome of

the proceedings." ***Commonwealth v. Chambers***, 807 A.2d 872, 883 (Pa. 2002). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Id.*** "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.*** "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." ***Id.***

Appellant insisted during trial proceedings that he was not involved in the incident leading to DeGennaro's death. Prior to trial, the Commonwealth filed a motion seeking to introduce evidence that, before DeGennaro's murder, Appellant had participated in a robbery with his co-conspirators, Henderson, Bakr and Jackson. The Commonwealth maintained that evidence of a prior drug dealer robbery, for which the conspirators were not caught, motivated their similar robbery of DeGennaro a short time later and established Appellant's participation in both, similar crimes. The trial court stated during a pretrial hearing that it was not inclined to allow this evidence unless the defense opened the door.

During trial, both Henderson and Bakr testified that Appellant participated in DeGennaro's robbery and murder. When Henderson testified, Appellant's counsel cross-examined her by emphasizing her relationships with Jackson, Bakr, and a third individual not implicated in the murder, Clark. When counsel explored Appellant's relationship with Henderson, it was

generally to question whether any relationship existed, or whether she had him confused with another person, Breon Holloway.

The Commonwealth claimed that counsel's cross-examination of Henderson opened the door for testimony regarding Appellant's participation in the prior robbery. The trial court agreed for the reason that Appellant "tried to lead the jury to believe that [] Henderson had no relationship with [Appellant.]" Trial Court Opinion, 1/22/16, at 63. Henderson's testimony was permissible to "correct the untrue impression that was created on the record that [] Henderson and [Appellant] had no relationship and that [] Bakr, [] Henderson, [] Jackson and/or [] Clark were the only ones who committed all the robberies." *Id.* at 61. The court limited the evidence to the date of the robbery, the people involved, and where it happened. In addition, the court instructed the jury:

> You also have heard testimony in this case about an alleged prior robbery at Orchard View Apartments. If you believe the testimony of Tatyana Henderson in that regard, you may not consider the testimony as evidence of [Appellant's] guilt in this case. Rather, I instruct you that this evidence was offered solely to show the relationships between the individuals who have been identified— between and among the individuals identified in this case. You have not been given any details of this alleged robbery, nor should you draw any inferences regarding the circumstances of the robbery. Indeed, you must not consider it as evidence of guilt or for any other purpose other than the one I have just given you. If you do not believe Tatyana's testimony in this regard, you must disregard this testimony and any implication regarding the relationships of the parties.

N.T. 10/4/13 (P.M. Session), at 31–32.

On direct appeal, this Court held that the trial court acted within its discretion by permitting Henderson's testimony concerning the prior robbery:

> This testimony elicited by the Commonwealth was probative of the relationship between the co-conspirators, as it tended to show that Appellant and [] Henderson did know each other, and that she had not confused him with Breon Holloway. It was a permissible refutation of the impression created by Appellant that [] Henderson had no relationship with him . . . Furthermore, the trial court minimized the prejudicial impact of this testimony by limiting [] Henderson's testimony to the people involved, the time, and the place of its occurrence. Thus, we do not find that this testimony would "inflame the jury's sensibilities with references to matters other than the legal proposition relevant to the case." *Commonwealth v. Ivy*, 146 A.3d 241, 253 (Pa. Super. 2016) (citation omitted).
>
> Moreover, the trial court . . . instructed the jury that the testimony was only to be used to consider [] Henderson's relationship with Appellant, and nothing more . . . Any prejudice caused by [] Henderson's testimony was alleviated by the court's instruction.

*Powell*, 171 A.3d at 301.

Appellant now contends that trial counsel was ineffective for opening the door for Henderson's testimony concerning Appellant's participation in the prior robbery. He argues that trial counsel cross-examined Henderson too aggressively, and by doing so, enabled the Commonwealth to inject evidence that presented him as a bad person to the jury.

This Court already has determined on direct appeal, however, that the testimony sought by defense counsel was not prejudicial to Appellant because it was not the type of evidence that would inflame the jury's sensibilities. In addition, the trial court alleviated any conceivable prejudice by instructing the jury to use the testimony solely to consider the nature of Henderson's

relationship with Appellant.  The claim, therefore, lacks merit.  Absent merit, Appellant's claim of ineffectiveness fails.  **Urwin**, 219 A.3d at 172 (claim of ineffective assistance fails unless petitioner satisfies all three prongs of ineffectiveness test).

In his second issue, Appellant argues that the police violated his constitutional rights under the federal and Pennsylvania constitutions by obtaining his and his co-conspirators' historical cellphone data without warrants.  He bases this argument on two decisions issued by the United States Supreme Court and Pennsylvania Supreme Court while his case was on direct appeal: (1) **Carpenter v. United States,** — U.S. —, 138 S. Ct. 2206 (2018), and (2) **Commonwealth v. Fulton**, 179 A.3d 475 (Pa. 2018).  Once again, no relief is due.

By obtaining call detail records for the various co-conspirators in this case, police were able to determine that each had traveled from Trenton to Levittown, where the murder occurred, and back again on December 28, 2011, and that all were in the area of the murder around the time of the murder.  In 2012, the statute governing governmental access to stored wire and electronic communications and transactional records permitted a provider of electronic communication service to disclose "a record or other information pertaining to a subscriber to or customer of service," other than contents of communications, to law enforcement officers when they used one of several means, including a grand jury subpoena.  18 Pa.C.S.A. § 5743(c)(2).  The

police obtained many cellphone records in this case through grand jury subpoenas, except for Appellant's text messages, which they obtained via search warrant.

On June 22, 2018, while Appellant's case was still on direct appeal,[2] the United States Supreme Court held, for the first time, that law enforcement officials violated an individual defendant's Fourth Amendment rights by obtaining his historical cell site location information from a third party carrier without first obtaining a search warrant supported by probable cause. *Carpenter*, 138 S. Ct. at 2216 (applying Fourth Amendment to a "new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals").[3] Similarly, in *Fulton* our Supreme Court held that accessing information from a cellphone without a warrant is unconstitutional under United States Supreme Court precedent. According to Appellant, since *Carpenter* and *Fulton* were issued during his direct appeal,

_____

[2] The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on April 3, 2018, two and a half months earlier. Nevertheless, Appellant had three months to file a petition for certiorari with the United States Supreme Court, or until July 2, 2018. U.S. Sup. Ct. R. 13(1). Thus, ten days remained in Appellant's direct appeal period on June 22, 2018.

[3] The Supreme Court emphasized that its decision was "narrow" and indicated that it was not expressing a view on real-time CSLI or "tower dumps" ("a download of information on all the devices that connected to a particular cell site during a particular interval"). *Id.* at 2220. The Court added that its decision was not calling into question "conventional surveillance techniques and tools, such as security cameras . . . or business records that might incidentally reveal location information." *Id.*

they require suppression of historical location information obtained from his cellphone. Appellant is not entitled to relief.

Section 9543(a)(3) of the PCRA, 42 Pa.C.S.A. § 9543(a)(3), provides that a petitioner is not eligible for relief if the allegation of error has been previously litigated or waived. Section 9544(b) of the PCRA, 42 Pa.C.S.A. § 9544(b), provides that an issue is waived if it could have been raised but was not, before trial, at trial, during unitary review, on appeal or in another state post-conviction proceeding. The issue Appellant attempts to raise is a suppression issue that had to have been raised pre-trial. Pa.R.Crim.P. 578, 581. Appellant's failure to do so precludes him from seeking relief during collateral review. Although his case was pending on direct appeal when both *Carpenter* and *Fulton* were issued, "in order for a new rule to apply to a case pending on direct appeal, the issue must be preserved at all stages of adjudication, including at trial and on direct appeal." *Commonwealth v. Hays*, 218 A.3d 1260, 1267 (Pa. 2019). Our review of the record demonstrates that Appellant did not raise this argument during trial proceedings, in this Court on direct appeal, or in his petition for allowance of appeal to the Pennsylvania Supreme Court. Appellant's failure to preserve this issue in accordance with *Hays* bars him from raising it now.

Nor do the decisions in *Carpenter* and *Fulton* entitle Appellant to relief based on ineffective assistance of counsel. Before both the PCRA court and this Court, Appellant did not couch this issue in terms of ineffective assistance.

- 14 -

If this was his intent, he waived any argument that *Carpenter* and *Fulton* gave rise to an ineffective assistance claim. *Commonwealth v. Mason*, 130 A.3d 601, 639-40 (Pa. 2015) (capital murder defendant failed to preserve PCRA claim that he was entitled to new trial on basis that Commonwealth exercised its peremptory challenges in gender-discriminatory manner, and that prior counsel were ineffective for failing to litigate issue, by failing to include claim in PCRA petition). Even if we construed Appellant's argument as a claim of ineffective assistance of counsel, relief still would be unavailable. As stated above, *Carpenter* and *Fulton* were decided after trial, Appellant's direct appeal to this Court, and his unsuccessful petition for allowance of appeal to our Supreme Court. "It is not ineffective assistance for counsel to fail to predict (and hence comply with) future changes in governing law. *Commonwealth v. Brown*, 196 A.3d 130, 178 (Pa. 2018) (citing *Commonwealth v. Mason*, 130 A.3d 601, 650 (Pa. 2017)).

For these reasons, the PCRA court properly denied relief to Appellant.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 4/29/2020*

- 15 -