2017 PA Super 303

| COMMONWEALTH OF PENNSYLVANIA | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | | |
| BREON POWELL | | |
| Appellant | | No. 1312 EDA 2014 |

Appeal from the Judgment of Sentence December 9, 2013
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003591-2012

BEFORE:  BENDER, P.J.E., BOWES AND SHOGAN, JJ.

OPINION BY BOWES, J.:                    **FILED SEPTEMBER 25, 2017**

Breon Powell appeals from the judgment of sentence of life in prison and a concurrent sentence of two-and-one-half to five years incarceration imposed after he was convicted of first degree murder, robbery, conspiracy to commit robbery, burglary, conspiracy to commit burglary, and possession of an instrument of crime.  We affirm.

The facts underlying this matter as are follows.  On December 28, 2011, Appellant, Jermaine Jackson, Kazair Gist, Tatyana Henderson, and Danasia Bakr traveled from Trenton, New Jersey to Levittown, Bucks County, in order to rob Daniel DeGennaro at gunpoint.  While casing Mr. DeGennaro's residence, Ms. Henderson placed a call to a phone number listed on a sign advertising the sale of a used-car, which was parked in the rear of Mr. DeGennaro's home.  Unbeknownst to the group, Mr. DeGennaro

allowed a neighbor to park the car in his back driveway. Ms. Henderson made contact with Mr. DeGennaro's neighbor, Nicholas Miller, and feigned interest in the car.

Shortly thereafter, Appellant, Mr. Jackson, and Mr. Gist entered Mr. DeGennaro's home. Ms. Henderson operated as a look-out, and Ms. Bakr remained in the car. The three men entered Mr. DeGennaro's residence armed with a shotgun and a nine millimeter handgun, and intended to recover money that the victim purportedly owed to Mr. Jackson. During a scuffle, the conspirators fired two shots at Mr. DeGennaro, striking him once. Mr. DeGennaro perished from the gunshot. The three men fled from the scene, met with the women, and returned to New Jersey.

An investigation ensued. Mr. Miller reported to police that he received a strange phone call regarding the used vehicle parked in Mr. DeGennaro's backyard shortly before his death. Investigating officers reviewed phone records and call logs and established that Ms. Henderson had placed the call to Mr. Miller from an area within 300 yards of Mr. DeGennaro's house. A review of Ms. Henderson's phone records also indicated that she had communicated with Ms. Bakr and Mr. Jackson around the time of the incident. Further investigation placed those phones, as well as Mr. Gist's and Appellant's phone, in close vicinity to Mr. DeGennaro's home at the time in question. Eventually, the police utilized wiretaps to monitor the cellular handsets associated with Ms. Henderson, Ms. Bakr, and Mr. Jackson wherein

they recorded evidence of the murder and attempted cover up. Ms. Bakr also made statements to police implicating herself, Ms. Henderson, Mr. Jackson, Mr. Gist, and Appellant, in the shooting death of Mr. DeGennaro.

On March 29, 2012, Appellant was arrested. He filed a motion to suppress the wiretap evidence, contending that the interception failed to conform to the dictates of the Wiretap Act. Specifically, Appellant argued that the officers made no attempt to minimize the interception of the communications. The trial court denied that motion. On May 29, 2013, the Commonwealth filed a motion for the introduction of prior bad acts evidence seeking, in part, the introduction of evidence related to an alleged robbery, which occurred shortly before Mr. DeGennaro's death, wherein Appellant, Ms. Henderson, Ms. Bakr, and Mr. Jackson accosted a drug dealer in Morrisville. The court denied that motion by order dated August 1, 2013.

Following trial, a jury acquitted Appellant of conspiracy to commit criminal homicide, and found him guilty of the aforementioned offenses. Thereafter, the court sentenced Appellant to life in prison on one count of first degree murder, a concurrent sentence of two-and-one-half to five years imprisonment for possession of an instrument of crime, and no further penalty at the remaining counts. Appellant filed a timely post-sentence motion, which was denied on April 3, 2014. He then filed a timely notice of appeal to this Court. After an extended delay during which the transcripts of Appellant's lengthy trial were produced, Appellant complied with the trial

court's order to file a Rule 1925(b) concise statement of matters complained of on appeal. On January 22, 2016, the trial court authored its Rule 1925(a) opinion. This matter is now ready for our review.

Appellant raises six issues for our consideration:

A. Was it error constituting a violation of due process under PA CONST Art. 1 § 9 and U.S.C.A. Const. Amend. 14 to allow an accomplice's uncorroborated testimony that [Appellant] had been involved in a prior robbery with the same conspirators as recently as 4 days before this offense?

B. Should a mistrial have been granted because the prosecution's summation was in violation of due process under PA CONST Art. 1, § 9 and U.S.C.A.Const. Amend. 14?

C. Was it error to allow photographs of [Appellant] and his codefendants at a firing range and huddled around two targets with bullet holes in them, rejecting an offer to stipulate that he used his phone at a business establishment located there?

D. Was it error to rule witness [Dennis] Leighton qualified as an expert in decoded language and error to allow his interpretation of codefendants' words?

E. Should wiretaps of Appellant's and co-conspirators' text messages and phone calls have been suppressed due to the failure to minimize the wiretaps in violation of U.S.C.A.Const. Amend. 4 and PA CONST Art. 1, § 8?

F. Was it error to allow Detective Coffman's unqualified testimony as an expert in the analysis of cell tower coverage and cell phone technology?

Appellant's brief at 6-7.

In his first issue, Appellant asserts that the trial court erred by permitting testimony regarding a previous robbery in which he allegedly participated with Ms. Henderson, Ms. Bakr, and Mr. Jackson. The

admissibility of evidence is a matter left to the sound discretion of the trial court. **Commonwealth v. Hicks**, 156 A.3d 1114, 1125 (Pa. 2017). We do not disturb evidentiary rulings absent an abuse of that discretion. **Id**. In addition, "evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." **Id**. (citation omitted); Pa.R.E. 404(b). Further, we note that a "litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." **Commonwealth v. Nypaver**, 69 A.3d 708, 716 (Pa.Super. 2013) (citation omitted).

The trial court found that Appellant opened the door to testimony regarding his participation in the prior robbery, which occurred shortly before the events in question. It highlighted that, during trial, Appellant "tried to lead the jury to believe that Ms. Henderson had no relationship with [Appellant.]" Trial Court Opinion, 1/22/16, at 63. It determined that such testimony was permissible to "correct the untrue impression that was created on the record that Ms. Henderson and [Appellant] had no relationship and that Ms. Bakr, Ms. Henderson, Mr. Jackson and/or Devon Clark were the only ones who committed all the robberies." **Id**. at 61. In permitting some testimony on the incident, the court limited the evidence to

the date of the prior robbery, the people involved, and where it happened.

Finally, the court provided the following jury instruction:

> You also have heard testimony in this case about an alleged prior robbery at Orchard View Apartments. If you believe the testimony of Tatyana Henderson in that regard, you may not consider the testimony as evidence of [Appellant's] guilt in this case. Rather, I instruct you that this evidence was offered solely to show the relationships between the individuals who have been identified – between and among the individuals identified in this case. You have not been given any details of this alleged robbery, nor should you draw any inferences regarding the circumstances of the robbery. Indeed, you must not consider it as evidence of guilt or for any other purpose other than the one I have just given you. If you do not believe Tatyana's testimony in this regard, you must disregard this testimony and any implication regarding the relationships of the parties.

*Id*. at 65; N.T. 10/4/13 (P.M. Session), at 31-32.

Appellant notes that, prior to trial, the court ruled that evidence of the earlier robbery was inadmissible and maintains that he did not otherwise open the door to such evidence. He argues that, since Ms. Henderson only testified to dissimilar crimes she committed with Mr. Jackson and Ms. Bakr, he did not open the door to testimony regarding the prior robbery. Appellant claims that, contrary to the court's findings, his line of questioning did not create an impression that Appellant had no relationship with Ms. Henderson or that he was uninvolved in previous crimes. Rather, he asserts, without further development, "the questions do not seem to create that implication in the slightest." Appellant's brief at 27. Finally, Appellant contends that, even if he had opened the door, the evidence was too

prejudicial, the court should have employed other means to remedy the situation, and its failure to do so violated Appellant's right to due process.

We find that Appellant opened the door to testimony regarding his participation in the prior robbery since he created the false impression that he had no relationship with Ms. Henderson. Appellant insisted throughout trial that he was not involved in the incident leading to Mr. DeGennaro's death. In cross-examining Ms. Henderson, Appellant emphasized Ms. Henderson's relationships with Mr. Jackson, Ms. Bakr, and a third individual not implicated in the murder, Devon Clark. *See* N.T. Trial, 9/23/13 (A.M. Session), at 28-30, 32, 34, 41-61, 70-71, 77-80, 87-88; N.T. Trial, 9/23/13 (P.M. Session), at 3-4. When Appellant did explore his relationship with Ms. Henderson, beyond their mutual participation in the death of Mr. DeGennaro, it was generally to question whether any relationship existed, or whether she had him confused with another person, Breon Holloway. *See* N.T. Trial, 9/23/13 (A.M. Session), at 64-65, 83-87.

In light of this testimony, we find that Appellant created an impression that he had no relationship with Ms. Henderson. In order to rebut this false impression, the trial court permitted Ms. Henderson to testify to the time, place, and participants involved in the prior alleged robbery. In so allowing, the court permitted Ms. Henderson to testify as follows:

> Prosecutor: Do you recall being asked whether or not you participated in a robbery before December 28, 2011?
>
> Ms. Henderson: Yes.

Prosecutor: How long before December 28, 2011 was that?

Ms. Henderson: It was between Thanksgiving and Christmas.

Prosecutor: Could you tell us where that took place?

Ms. Henderson: Orchard View Apartments in Morrisville.

Prosecutor: And could you please tell us each and every person that was involved in that robbery?

Ms. Henderson: It was me, Danasia, Breon and Jermaine . . ..

. . . .

Prosecutor: When you say Breon, what Breon are you talking about? Did you know his last name at the time?

Ms. Henderson: No.

Prosecutor: Can you identify him?

Ms. Henderson: Yes.

Prosecutor: Is he here in court today?

Ms. Henderson: Yes.

Prosecutor: Can you point him out?

Ms. Henderson: He has on a blue shirt and a sweater on top [Identifying Appellant].

N.T. Trial, 9/24/13 (P.M. Session), at 63-65.

This testimony elicited by the Commonwealth was probative of the relationship between the co-conspirators, as it tended to show that Appellant and Ms. Henderson did know each other, and that she had not confused him with Breon Holloway. It was a permissible refutation of the impression

created by Appellant that Ms. Henderson had no relationship with him. *Nypaver*, *supra*. Furthermore, the trial court minimized the prejudicial impact of this testimony by limiting Ms. Henderson's testimony to the people involved, the time, and the place of its occurrence. Thus, we do not find that this testimony would "inflame the jury's sensibilities with references to matters other than the legal proposition relevant to the case." *Commonwealth v. Ivy*, 146 A.3d 241, 253 (Pa.Super. 2016) (citation omitted).

Moreover, the trial court, as noted above, instructed the jury that the testimony was only to be used to consider Ms. Henderson's relationship with Appellant, and nothing more. N.T. Trial, 10/4/13 (P.M. Session), at 31-32. Appellant did not object to this instruction. *Id*. at 34. Any prejudice caused by Ms. Henderson's testimony was alleviated by the court's instruction. As such, we find that the trial court did not abuse its discretion in permitting Ms. Henderson to testify to the details of this incident, and no relief is due.

Appellant next contends that the trial court erred in failing to grant a mistrial based on the cumulative effect of the prosecutor's alleged misconduct during summation. Our review is guided by the following principles:

> The review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will

. . . discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa.Super. 2014) (citation omitted).

Further, when a motion for a mistrial is premised upon prosecutorial misconduct, "it is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." *Commonwealth v. Melvin*, 103 A.3d 1, 26 (Pa.Super. 2014) (citation omitted). A new trial is warranted where "the unavoidable effect of the conduct or language was to prejudice the factfinder to the extent that the factfinder was rendered incapable of fairly weighing the evidence and entering an objective verdict." *Id*. We have held, "[t]he Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." *Id*. As such, "[t]he touchstone is the fairness of the trial, not the culpability of the prosecutor." *Id*.

We have previously stated that "not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial." *Commonwealth v. Scott*, 146 A.3d 775, 778 (Pa.Super. 2016) (citation omitted). Rather, "the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may

advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom." *Id*. at 778-779. Finally, "the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation." *Id*. at 779.

Appellant contests various aspects of the prosecutor's closing presentation, which we present together before analyzing separately. In addition to briefly publishing a picture of the victim playing guitar during his concluding remarks, the prosecutor made the following statements:

> Prosecutor: But along those lines, ladies and gentlemen, because I mean what I say, I feel that everything that you've heard has some import, it's for you to decide what type of import it has, and I am sure, I hope, that you took notice yesterday, which was a long day for all of us, I did not object once. I bit my tongue, I held my words back.
>
> . . . .
>
> Prosecutor: [Defense Counsel] tells you that this is a search for doubt. It's not a search for doubt. This is a search for the truth as to what happened on December the 28th.
>
> . . . .
>
> Prosecutor: Conversely, there were no objections from me when [Defense Counsel] --
>
> Defense Counsel: Objection to this.
>
> Prosecutor: -- skillfully, surgically --
>
> Defense Counsel: Objection. Objection.

- 11 -

The Court: Sustained. Sustained. Don't comment on the strategies of the lawyers' objections.

Prosecutor: Skillfully, surgically, and for days sliced her and diced her --

Defense Counsel: Objection, Judge.

Prosecutor: -- to make her look --

The Court: Overruled.

. . . .

Prosecutor: Think about this. You are going to rob a drug dealer, what are the odds you are going to get away with it? Well, if you don't kill anybody, pretty good. Why? Drug dealers don't call the cops. That's the cost of doing business. That is also why there was no record of the Orchard View robbery when Detective Beidler was asked about that. I submit to you that was another robbery involving [Appellant], Jackson, Bakr, and Henderson of a drug dealer just before the December 28th robbery and murder.

. . . .

Prosecutor: [Detective Munger] was accused, boldly accused by [Defense Counsel] of planting this newspaper. I thought he was gonna get up and strangle her.

. . . .

Prosecutor: You haven't heard too many good things about [the victim]. But he was a father to Gia DeGennaro . . . He was a son to his mom, he lived in his mother's house. He was a brother. He was a real, living, breathing person.

. . . .

Prosecutor: I am now asking you to hold [Appellant] accountable, you speak for Danny DeGennaro when you come back here with your verdict.

- 12 -

N.T. Trial, 10/4/13 (A.M. Session), at 11, 14, 52-53, 64-65, 89, 198-199, 202.

Appellant highlights the prosecutor's characterization of the case as a "search for truth" as opposed to a "search for doubts," asserting that this was especially injurious to the defense's case in light of the jury's supposed tendency to give special weight to the Commonwealth's arguments. Appellant's brief at 36. We note that Appellant did not object to the prosecutor's statement regarding the "search for truth." *Id*. at 14. Hence, this claim is waived. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Nonetheless, the prosecutor's comment was a fair response to the defense's summation, which highlighted twenty-seven points of doubt, and the trial court properly outlined the Commonwealth's burden of proof during the jury charge. N.T. Trial, 10/4/13 (P.M. Session), at 33. We assume that the jury followed the court's instruction. *Commonwealth v. Bullock*, 913 A.2d 207, 218 (Pa. 2006) (noting that jurors are presumed to have followed the court's instructions). Thus, even if this question were properly before us, relief would not be due.

Appellant also argues that the prosecutor inappropriately provided the jury with details of a prior robbery which were found inadmissible by the trial court. Further, he insists that the prosecutor's proclamation that he purposely did not object during Appellant's summation or at various points

during testimony portrayed the defense in an unfair light and exceeded permissible grounds of advocacy.

The trial court found that the prosecutor's statements in this regard were not overly prejudicial to Appellant. Moreover, it provided a curative instruction after defense counsel objected to those statements. For example, the court informed the jury that Appellant

> [has] an absolute constitutional right, first of all, to a jury trial. A constitutional right to confront their accusers and to advocate zealously for their client. To the extent that there is any inference that that is inappropriate . . . you're to disregard that. To the extent that counsel is arguing as to the credibility of the witness on cross-examination, that's appropriate.

N.T. Trial, 10/4/13 (A.M. Session), at 53-54; **see also id**. at 65, 106. Defense counsel assented to the various instructions offered by the court in order to cure the prejudice caused by the prosecutor's various declarations, and we find that these instructions adequately mitigated any potential prejudice. Thus, this claim merits no relief.

Next, Appellant challenges the prosecutor's use of a picture of the victim, and statements regarding his family life, as an attempt to inflame the passions of the jury. The trial court found that the picture and statement were appropriate to establish the victim as a life in being. It noted that the victim's daughter, Gia DeGennaro, had offered testimony about her relationship with her father and authenticated the picture shown to the jury. N.T. Trial, 9/3/13, at 119, 129. We find that the prosecutor was merely reiterating evidence presented at trial to support his position. Further, the

statements he made about the victim and his family while presenting the picture were mere oratorical flair, intended to inform the jury of context in which the victim was murdered.

Finally, Appellant maintains that the prosecutor's concluding remarks, that the jury must "speak for" the victim, improperly urged the jury to ignore its duty to decide the matter on the facts in evidence and the law. *Id*. at 38-39. We observe that defense counsel did not timely object to the prosecution's invocation that the jury must speak on behalf of the victim. N.T. Trial, 10/4/13 (A.M. Session), at 202-203. Thus, this claim is waived. Pa.R.A.P. 302(a). Nevertheless, the court, at co-defendant's counsel's insistence, did supplement the jury instructions as follows:

> The lawyers, quite appropriately, at the end of any summation make their final appeal to you. But I want to be clear about something. The verdict that you reach here, as I have had said, is not to speak for the person who was killed, that would not be proper. [It] is not to in any way render some kind of judgment. Your verdict must be based on evidence you have heard and the legal standards that I have given you. That [is] what your verdict must be.

N.T. Trial, 10/4/13 (P.M. Session), at 88-89. *See Commonwealth v. Tyson*, 119 A.3d 353, 362 (Pa.Super. 2015) (noting "to alleviate the potential for unfair prejudice, the court can issue a cautionary instruction to the jury," and that "[j]urors are presumed to follow the trial court's instructions."). Thus, any potential prejudice caused by the prosecutor's statements was mollified by the court's instruction.

In summary, upon review of the certified record, we find that not one of the statements, either alone or collectively, prejudiced the jury unavoidably or formed in their minds a fixed bias or hostility that would prevent them from properly weighing the evidence and rendering an objective verdict. *Melvin*, *supra*. Where the prosecutor's statements did raise the specter of prejudice, the trial court formulated clear and specific jury instructions to alleviate the harm. As such, the trial court did not abuse its discretion in denying Appellant's motion for a mistrial, and this claim fails.

Appellant's third issue challenges the court's decision to allow the Commonwealth to offer evidence obtained when Appellant attended a firing range with other individuals implicated in Mr. DeGennaro's death. As an evidentiary matter, we are again bound by our standard of review enunciated above. *Hicks*, *supra*. Further, under the Pennsylvania Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Appellant assails the trial court's rulings with regard to three photographs of him and his co-conspirators taken at a firing range, and testimony offered by the Commonwealth that he used his cell phone while there, which was corroborated with cell phone tower data. He claims that the photographs and testimony were highly prejudicial, and such prejudice

- 16 -

could have been avoided if the prosecutor had accepted his offer to stipulate that the photographs were taken at "an establishment," rather than informing the jury that Appellant attended a firing range. Appellant's brief at 44.

The trial court recounted the disputed evidence as follows:

During the trial, the [trial court] admitted three still images taken from the video surveillance footage at Ready, Aim, Fire [the shooting range]: C-102B, an image of Mr. Jackson, [Appellant], Kazair Gist, and Devon Clark gathering around two used shooting targets; C-102C, an image of [Appellant] on his cell phone in the showroom; C-102D, an image showing the handshake between the son of the shooting range owner and [Appellant] after [Appellant] introduced himself.

Trial Court Opinion, 1/22/16, at 33. The court also heard testimony from Detectives Gregory Beidler and Jack Slattery. Detective Beidler testified that the cell tower data near the shooting range indicated that a call was made by a cell phone linked to Appellant while Appellant was there. N.T. Trial, 9/11/13, at 33-38. This call was captured in the second photo offered into evidence. Detective Slattery testified that he took part in the search of Appellant's residence where a used shooting target was discovered. *Id*. at 314. The detective stated that target discovered was the same target pictured in one of the photographs from the shooting range. *Id*. at 315.

The court determined that the probative value of this evidence outweighed its prejudicial effect. It noted that Appellant contested his involvement in the crime, and specifically denied being present during its commission, despite cell phone data to the contrary. The court observed

that the image capturing Appellant on a phone established that he was linked to that particular cell phone number when viewed in combination with the cell tower data collected by the investigating officers. It further stated that the pictures tended to corroborate the relationship among the co-conspirators, and that the used shooting target connected Appellant to evidence of the crime discovered during the search of his residence. With regard to Appellant's proposed stipulation, the court opined "[u]nfortunately we can't sanitize [the pictures], they didn't choose to meet at a church." *Id*. at 294.

First, we note that Appellant's proposed stipulation is a *non sequitur* in our analysis. The court took reasonable measures to limit the impact of the photographs in question, and it was not bound to rely on Appellant's proposed palliative measure. Moreover, even if the court had presented the pictures to the jury as being taken in "an establishment," as Appellant suggests, the context and location of the pictures was obvious, and such measures would have been an exercise in futility.

Next, we find the trial court did not abuse its discretion in determining that the probative value of the photographs and testimony outweighed its prejudicial effect. Appellant denied being present for the commission of the crime, despite evidence to the contrary. Hence, cell phone tower data tending to show that Appellant was connected to the cell phone located near Mr. DeGennaro's house on the night in question was highly probative in

refuting his alibi defense. In addition, the photographs linked Appellant to other suspects in the crime, specifically Mr. Jackson and Mr. Gist, and evidence implicated in that crime, *i.e.*, the shooting target that was later found in Appellant's bedroom with the gym bag used to transport the shotgun employed in the killing. ***See*** N.T. Trial, 9/16/13, at 26-28 (describing how, after returning to New Jersey, Appellant placed the shotgun in his gym bag before walking away). Thus, the trial court did not abuse its discretion in permitting this evidence, and Appellant's claim fails.

As Appellant's fourth and sixth claimed errors contest the admission of expert testimony offered by the Commonwealth, we consider them together. It is well-settled that

> [t]he admission of expert testimony is a matter of discretion for the trial court, and will not be disturbed absent an abuse of discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused.

***Commonwealth v. Poplawski***, 130 A.3d 697, 718 (Pa. 2015) (citation and quotation marks omitted). Expert testimony is governed by Pa.R.E. 702, which reads,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

     (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

     (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. We have previously held that the "standard for qualifying an expert is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible." ***Commonwealth v. Kinard***, 95 A.3d 279, 288 (Pa.Super. 2014) (*en banc*) (citation omitted). Further, "[t]he witness's expertise may be based on practical, occupational, or other experimental training; it need not have been gained through academic training alone." ***Id***.

Appellant alleges that the trial court erred in qualifying the Commonwealth's expert in interpreting coded language associated with street culture, Officer Dennis Leighton, since the officer "did not know the names of any actual persons that did studies on this subject, stated that there were no learned treatises on the subject, that he had never lectured on coded language associated with street culture just specifically to gangs[, and he] held no certifications." Appellant's brief at 49. Appellant also takes issue with Officer Leighton's qualifications since the officer's training and knowledge centered largely upon gang activity. He claims that the officer's testimony in this regard "strongly injected the specter of gang activity into the case[.]" ***Id***. at 46. Thus, he concludes that the Commonwealth's

"exploration of this expert's qualifications was to prejudice the jury with the continuous barrage of testimony regarding gangs." *Id*. at 49.

Instantly, the Commonwealth offered the testimony of Officer Leighton as an expert in coded street language. It questioned him extensively regarding his qualifications. Officer Leighton testified that he has been employed by the Bristol Township police for eleven years. He was also assigned to an FBI task force that conducted investigations into narcotics distribution and violent crimes. Through his training, Officer Leighton gained expertise dealing with "criminal street gangs, hate groups, outlaw motorcycle gangs, [and] narcotics trafficking." N.T. Trial, 9/19/13 (P.M. Session), at 78. In addition, the officer had acquired special training in interpreting coded language associated with street culture, including 400 hours of training from various law enforcement agencies. He attended training seminars through his membership with the East Coast Gang Investigator's Association, and lectured on criminal street gangs on thirty-two occasions. Officer Leighton stated that he developed his expertise in coded language "through the trainings that I have attended, as well as through my life experiences on the job; be it, through arrests, interviews of cooperators, debriefing persons that we arrested and corroborators, things of that nature." *Id*. at 81. He was also familiar with street terminology through his undercover work.

We find no abuse of discretion in the qualification of Officer Leighton as an expert in coded language associated with street culture. Officer Leighton's training and law enforcement experience indicated that he possessed a reasonable pretension towards specialized knowledge beyond that of the average layperson as it relates to coded street language, which would aid the trier of fact in understanding the communications amongst the co-conspirators herein. ***Kinard***, ***supra***. That the officer did not gain this knowledge through learned treatises or academic publications is of no moment, as his practical and occupational training is sufficient. ***Id***.

With regard to Appellant's contention that the discussion of Officer Leighton's qualifications unduly prejudiced the jury, we disagree. Following the discussion of the officer's qualifications, the court cautioned the jury as follows:

> Members of the jury, you will hear no evidence in this case that either defendant is or ever has been a member of a street gang or a hate group. The type of language used in the communication presently during this trial is not evidence of any kind of criminal activity, rather, you should consider the content of the communications in light of all the evidence you will hear in this case.

N.T. Trial, 9/19/13 (P.M. Session), at 83. Appellant did not object to this cautionary instruction, and we presume the jury followed it. ***Tyson***, ***supra***. Nevertheless, after the court cautioned the jury, the Commonwealth offered no evidence through the officer implicating gang activity. Rather, Officer Leighton's testimony centered upon his interpretation of certain words

utilized by Appellant's co-defendant in text messages he sent shortly before the incident in question. Hence, we find that the trial court did not abuse its discretion in permitting Officer Leighton to opine on coded language associated with street culture.

Appellant's sixth issue contests the Commonwealth's expert analysis of cell tower coverage offered through Detective Joseph Coffman. Our standard of review remains as stated above. *Poplawski*, *supra*. In addition, "the proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa.R.E. 702, which includes showing that the *Frye* rule, is satisfied."[1] *Commonwealth v. Freeman*, 128 A.3d 1231, 1246 (Pa.Super. 2015) (citation omitted). Our High Court has held that, "[i]n determining whether novel scientific evidence is admissible in criminal trials, Pennsylvania courts apply the test set forth in *Frye*." *Id*. (citing *Commonwealth v. Topa*, 369 A.2d 1277, 1281 (Pa. 1977)).

Under *Frye*, "to be admissible, such evidence must have gained general acceptance in the relevant scientific community." *Id*. However, "a *Frye* analysis is not triggered every time science enters the courtroom; it only applies when an expert seeks to introduce novel scientific evidence." *Commonwealth v. Dengler*, 843 A.2d 1241, 1243 (Pa.Super. 2004).

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

Finally, "[w]hile an expert need not use 'magic words,' the foundation of [his] opinion must still be sturdy . . . the expert must base the substance of [his] opinion on a reasonable degree of certainty instead of mere speculation." *Commonwealth v. Gonzalez*, 109 A.3d 711, 727 (Pa.Super. 2015) (citation omitted).

Appellant's argument is two-fold. First, he posits that the Commonwealth did not sustain its burden of establishing that the detective's methodology was generally accepted in his field. Second, he asserts that Detective Coffman failed to render his expert opinion within a reasonable degree of scientific certainty. Thus, he concludes that the trial court erred in permitting Detective Coffman to testify regarding cell tower and cell phone data collected and analyzed during the investigation into Mr. DeGennaro's death.

Instantly, Appellant requested a *Frye* hearing to challenge, *inter alia*, the basis of Detective Coffman's testimony. The court held a hearing on that motion on July 29, 2013. At that hearing, the court observed,

> I have a general motion filed listing experts [and] saying that the expert testimony is challenged. I have nothing else before me at this point . . . However, it's clear to me under cases relied upon by the defense, as well as the case provided by the Commonwealth that the defense, first, must have the burden of setting this up in terms of saying that this is novel scientific evidence.

N.T. Hearing, 7/29/13, at 15-16. The trial court determined that a *Frye* hearing was not necessary at that juncture since Appellant had not made a

- 24 -

showing that Detective Coffman's testimony was not based on accepted scientific methodology. In light of this discussion, the Commonwealth did not present expert testimony at the hearing, and accordingly, it did not produce testimony detailing the scientific basis behind Detective Coffman's cell phone data and tower analysis. The court then denied Appellant's motion without prejudice to refile. *Id*. at 35. Thereafter, Appellant did not refile or otherwise attempt to prove that Detective Coffman's expert testimony relied on novel scientific evidence. Thus, the court did not hold a *Frye* hearing, and the case proceeded to trial.

Nevertheless, Appellant maintains on appeal that the Commonwealth bore the burden of establishing that Detective Coffman's expert opinion was based on information that was generally accepted in his field. We disagree. We note that Pa.R.E. 702(c) incorporates the *Frye* standard. *See Grady v Frito-Lay*, 839 A.2d 1038, 1042 (Pa. 2003) (noting that the *Frye* test "is part of Rule 702."). As such, the trial court need only analyze this element of Rule 702 when *Frye* is implicated, that is, when **novel** scientific evidence is at issue. As Appellant failed to demonstrate that Detective Coffman's testimony was based on novel scientific evidence, such a finding was unnecessary. *Commonwealth v. Safka*, 95 A.3d 304, 307 (Pa.Super. 2014) (observing the *Frye* test is two-part, the first of which is, "the party opposing the evidence must show that the scientific evidence is 'novel' by demonstrating that there is a legitimate dispute regarding the reliability of

the expert's conclusions."). Thus, the trial court did not abuse its discretion in permitting this testimony.

The second facet of Appellant's argument alleges that Detective Coffman failed to render his expert opinion within a reasonable degree of scientific certainty. Appellant argues that Detective Coffman merely indicated that he was "reasonably sure" when he rendered his expert opinion, rather than stating it within the requisite reasonable degree of certainty. Appellant's brief at 57. As this contention is belied by the record, no relief is due.

At trial, Detective Coffman testified to certain radii he placed on a map, which reflected the operational range of cell phone towers near Mr. DeGennaro's residence. Importantly, we note that a cell phone generally relies on the tower with the strongest signal at the time a call or text message is made. Thus, the cell phone tower range is probative of the approximate location of a particular handset when a call is placed or a text message is sent. Detective Coffman averred that he estimated the range of each tower in question based on the location of nearby towers and an expected amount of overlap in the coverage areas. N.T. Trial, 9/25/13 (P.M. Session), at 95, 119.

During Detective Coffman's testimony, Appellant questioned the accuracy of these circles, arguing that they were only based on estimates.

On appeal, Appellant focuses on the following exchange, which occurred during cross-examination:

> Defense Counsel: But when [the prosecutor] asked you your opinion, you gauged it in terms of within a reasonable degree of certainty.
>
> Detective Coffman: That's correct.
>
> Defense Counsel: Are you certain that the phone is in those circles or is it an estimate, sir?
>
> Detective Coffman: I'm reasonably sure that this is the coverage area.
>
> Defense Counsel: Reasonably sure?
>
> Detective Coffman: Yes.
>
> Defense Counsel: So is that certain or is that an estimate?
>
> Detective Coffman: That's reasonably sure.
>
> Defense Counsel: So you're only reasonably sure?
>
> Detective Coffman: Yes.

N.T. Trial, 9/25/13 (P.M. Session), at 89.

Notwithstanding this discussion, on direct examination, Detective Coffman offered his expert opinion within a reasonable degree of certainty as to the cell tower coverage and the location of Appellant's cell phone within those areas. N.T. Trial, 9/25/13 (A.M. Session), at 108-109, 110, 120, 126, 129. Thus, the record establishes that Detective Coffman's testimony met the standard for admissibility. ***Gonzalez***, ***supra***.

We do not find, as Appellant suggests, that Detective Coffman's conclusions were merely speculative. In determining the location of the cell phones on the night in question, Detective Coffman reviewed the tower location and sector utilized by the handsets associated with each conspirator, including the telephone used by Appellant. To estimate the coverage area of the towers in the vicinity of Mr. DeGenarro's house, the detective considered the topography of the area, capacity of the tower, and other factors which would affect the strength of the tower's signal, such as absorption, attenuation, terrain, and obstacles in the area. *Id*. at 79-80; 104. The detective added that the towers were situated so that coverage areas overlapped, in order to maximize efficacy of the network as a whole. *Id*. at 80. Further, he specified that the towers relevant to Appellant were divided into sectors depicting a 120 degree portion of the tower's coverage area. *Id*. at 106. He did concede that the coverage area does not have a definitive range, but that the area depicted in his report was merely a representation. *Id*. at 106, 129.

Detective Coffman expressed, within a reasonable degree of professional certainty, that, based on the tower location and sector data that he reviewed, the handset associated with Appellant was located in Trenton, New Jersey, around the time the conspirators congregated, and not within the coverage range for Appellant's place of employment where Appellant claimed he was during the criminal episode. *Id*. at 121, 129. Further, he

opined that the handset associated with Appellant was in close proximity to Mr. DeGennaro's residence before and at the time Mr. DeGennaro was attacked. N.T. Trial, 9/25/13 (P.M. Session), at 12-13, 18, 21-22.

When considering Detective Coffman's testimony as a whole, we find it was sufficiently definite with regard to the location of the cell phone towers and sectors utilized by Appellant's cell phone at all relevant times. That the total coverage area was based on estimates is not dispositive, as the tower location and sector information he provided was unambiguous. Insofar as the detective's expert opinion relied on his analysis of this information, we find the foundation of his testimony to be robust, and thus, offered within a reasonable degree of professional certainty. *Gonzalez*, *supra*. As such, the trial court did not abuse its discretion in permitting Detective Coffman's expert testimony to be offered into evidence.

Appellant's fifth issue challenges the trial court's denial of his motion to suppress wiretap evidence. It is well-settled that "our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Jaynes*, 135 A.3d 606, 610 (Pa.Super. 2016) (citation and internal brackets omitted). Further,

> [w]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are

bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Id*. Specifically, Appellant contends that the officers monitoring the wiretaps failed to comply with the wiretap order's minimization plan. The Wiretapping and Electronic Surveillance Control Act ("Act") requires agents conducting wiretap investigations to develop and enact a minimization plan to limit the capture of non-pertinent communications. The Act reads, in relevant part:

> (b) Time limits.--No order entered under this section shall authorize the interception of any wire, electronic or oral communication for a period of time in excess of that necessary under the circumstances. Every order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this chapter by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by said order. In the event the intercepted communication is in a code or foreign language and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. No order entered under this section shall authorize the interception of wire, electronic or oral communications for any period exceeding 30 days. The 30-day period begins on the day on which the investigative or law enforcement officers or agency first begins to conduct an interception under the order, or ten days after the order is entered, whichever is earlier.

18 Pa.C.S. § 5712(b).

In order to effectuate this provision, agents of the Commonwealth, when seeking authorization from this Court to utilize a wiretap, are required to submit a minimization plan outlining the efforts that will be undertaken to minimize or eliminate the interception of non-pertinent communications, and

reduce the total hours of interception. In practice, minimization proceeds on two fronts: extrinsically and intrinsically. Extrinsic minimization pertains to the efforts employed by investigators to limit the total number and duration of the intercepted communications. *Commonwealth v. Doty*, 498 A.2d 870, 883. (Pa.Super. 1985). Intrinsic minimization refers to the techniques used by the monitors to abate the intrusion into the participants' privacy while in the process of intercepting a particular communication. *Id*.

As an investigation progresses, investigators must also submit amended minimization plans that reflect the shifting balance between their investigatory needs and the protection of the target's right to privacy. Thus, as the surveillance proceeds, the minimization plan may be enlarged or narrowed as the circumstances dictate. The initial minimization plan and any amended plans are subject to the approval of the supervising judge. 18 Pa.C.S. § 5712. The Act permits the contents and evidence obtained during a wiretap investigation to be excluded from a court proceeding where "[t]he interception materially deviated from the requirements of the order of authorization," including material deviations from the minimization plan. 18 Pa.C.S. § 5721.1(b)(4).

When considering whether a wiretap investigation was lawfully conducted with regard to a minimization plan, this Court in *Doty*, *supra*, adopted the test enunciated in *Scott v. United States*, 436 U.S. 128 (1978). In *Scott*, the United States Supreme Court articulated the

guidelines for evaluating compliance with the wiretap minimization requirement under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which governs federal wiretaps. The High Court observed that the "statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, *supra* at 140. It found that "[w]hether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case." *Id*.

The High Court emphasized certain circumstances it found relevant in analyzing a wiretap investigation, such as, "the nature of the investigation, the length of calls, the percentage of pertinent calls, whether calls are repeatedly between the same parties, whether the contents of calls are ambiguous, whether coded or guarded language is used, and whether patterns develop during the surveillance." *Doty*, *supra* at 883 (citing *Scott*, *supra*.). Further, it observed that "when the investigation is focusing on what is thought to be a widespread conspiracy[,] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, *supra* at 140.

In *Doty*, we recognized the delicate balance that must be struck between a citizen's privacy and the "legitimate law enforcement aims to be pursued." *Doty*, *supra* at 882. Nonetheless, we found that "[a]n overly

restrictive interpretation of the minimization requirement" under the Act would "make it impossible to use a telephone intercept" as a means for investigating necessarily secretive criminal activities. *Id*. at 883-884. Parroting *Scott*, we held that "minimization must be a question of what is reasonable and practical under the circumstances of each case." *Id*.

Herein, the Commonwealth conducted wiretap surveillance of four telephone numbers. Two of those numbers were associated with Mr. Jackson, and one each was used by Ms. Bakr and Ms. Henderson. During its surveillance of those lines, the Commonwealth intercepted communications between Appellant and those individuals.

The initial minimization plan approved for each of these wiretaps provided, in relevant part, that all wire and oral communications placed from or received by the target phone numbers would be intercepted to determine whether they contained evidence concerning the murder of Mr. DeGennaro. During an intercept, the monitor was directed to determine within the first two minutes whether the communication was pertinent to this endeavor. If it found that the phone call was pertinent, the monitor was permitted to record it in its entirety. If the communication was found to be non-pertinent, the monitor was instructed to terminate recording and engage in only spot-check supervision of the communication.

The spot-check procedure required the monitor to cease recording for two minutes if a communication was deemed non-pertinent following the

initial two-minute intercept. Upon the expiration of that two minute abstention, the monitor could resume supervision of the call for an additional minute. If the call remained non-pertinent during this minute, the monitor was directed to cease recording for at least two minutes, and thereafter, the spot-checking process was to be repeated as necessary.[2] If, however, the monitor determined that the call became pertinent to the investigation during a spot-check, it was authorized to record the remainder of the interaction.

Appellant argues that the Commonwealth materially deviated from the wiretap order by failing to comply with this minimization plan. He alleges that the monitors did not make any attempt to extrinsically minimize the wiretap investigation since it was permitted to operate twenty-four hours a day for the duration of the intercept. Further, he contends that the monitors did not intrinsically minimize approximately 200 to 300 of the telephone calls.[3] He concludes that the appropriate remedy for a violation of this

---

[2] During the course of the investigation, the minimization plan was amended to permit the monitors to spot-check for two minutes, followed by one minute where the wiretap was turned off. N.T. Hearing, 12/11/12, at 130-131.

[3] Appellant does not cite to any particular occurrence in the record wherein the Commonwealth failed to minimize a communication involving him, and indeed, we listened carefully to the intercepts and Appellant's conversations were properly minimized. Nevertheless, the Act permits any "aggrieved person" to move to exclude the contents of any wire, electronic or oral communication. 18 Pa.C.S. § 5721.1(b). Since the Act broadly defines an
*(Footnote Continued Next Page)*

nature is suppression of all the communications intercepted, since mere suppression of the non-pertinent phone calls which gave rise to the violation would not sufficiently deter the Commonwealth from engaging in such conduct.[4]

Following extensive hearings on Appellant's motion to suppress, the suppression court denied his motion finding, *inter alia*, that the minimization plan was approved by the supervising judge, that the interceptions were used to obtain evidence of an ongoing conspiracy, that the minimization plans were signed by the monitors and posted in the monitoring location, that many of the calls were between the same people, that most of the phone calls were brief, that there was no pattern to the communications, that many of the calls used guarded, coded, or ambiguous language, and that between 200 to 300 calls were not properly minimized. N.T. Suppression, 4/25/13, at 146-149.

Based on the foregoing, the suppression court concluded that the minimization plan was "reasonable and practical under the circumstances of

*(Footnote Continued)* ─────────

"aggrieved person" as "a person who was a party to any intercepted wire, electronic or oral communication or a person against whom the intercept was directed," **see** 18 Pa.C.S. § 5702, and since it is uncontested that Appellant was a party to an intercepted communication, this shortcoming does not affect our analysis.

[4] We observe that, although Appellant delineated the factors applied by the United States Supreme Court in **Scott v. United States**, 436 U.S. 128 (1978), he did not develop any argument analyzing how those circumstances are implicated herein.

this case," that "the manner in which the wiretap was conducted did not oppose a greater invasion of privacy [than] was reasonably necessary," that "24 hour a day surveillance was not unreasonable," and that "the Commonwealth did not materially deviate from the minimization plans as ordered[.]" *Id*. at 149-150.

In its Rule 1925(a) opinion, the court reviewed the **Scott** factors and found that the interceptions were reasonable under **Scott** since "each of the calls was around two minutes, there was no pattern to the intercepted calls, many calls involved co-conspirators, and most of the calls used coded language that made it difficult to interpret the subject matter of the call immediately." Trial Court Opinion, 1/22/16, at 32. The court noted, "although there were a number of calls that were not minimized in less than two minutes, it was sometimes impossible for the detectives to determine that the subject matter was proper for minimization in the allotted time." *Id*.

Upon review of the certified record, we hold that the suppression court's findings of facts are supported by the record, and that it did not err in denying Appellant's motion to suppress. Instantly, the Commonwealth sought authorization to wiretap Mr. Jackson, Ms. Bakr, and Ms. Henderson in order to investigate the criminal conspiracy which led to the death of Mr. DeGennaro. That application included the aforementioned minimization plan, which was approved by the supervising judge, reviewed and signed by

the monitoring officers, and posted at the monitoring station. N.T. Hearing, 9/7/12, at 103-104, 108-110. The Commonwealth intercepted approximately 22,000 communications between February 13, 2012, and March 13, 2012, when the wiretap on all four lines terminated.[5] The majority of the intercepted telephone calls were brief, lasting less than the two minutes provided by the minimization order. The Commonwealth deemed 6,039, or twenty-seven percent, of those communications to be pertinent, primarily to the murder of Mr. DeGennaro, but also as evidence of other crimes.

Of the communications deemed non-pertinent, Appellant has not indicated which telephone calls were not properly minimized. Nevertheless, the Commonwealth concedes that, of the 488 calls in excess of two-minutes, approximately 280, or roughly three-and-one-half-percent, of the approximately 8,000 telephone calls intercepted were not properly minimized. Appellee's brief at 71 n.10; N.T. Hearing 4/25/13, at 127.

_____

[5] Certain communications intercepted by the Commonwealth were redundant messages, and thus there are fewer distinct messages than the number reported by the monitor's wiretap logs. This redundancy is an artifact of modern wiretap technology which retains a constant connection to the communication facility's server. On the other hand, a cellular handset does not always maintain a connection to the server. Hence, in some cases an incoming message destined for that handset will be stored on the communication facility's server. The server will periodically attempt to retransmit the message until the handset regains a connection, at which point the message will be delivered. As a result of this quirk of modern communication technology, the Commonwealth "intercepts" duplicate versions of some individual communications.

In light of these circumstances of this case, we find that the wiretap minimization plan utilized by the Commonwealth was a reasonable means to track and uncover the conspiracy in which Appellant participated in regard to both the murder of Mr. DeGennaro and the subsequent cover up. The twenty-four hour connection was a practical necessity given the technological requirements of working with the communications facility and the extensive communications between the co-conspirators. Those communications demonstrated no consistent pattern, and the investigators intercepted pertinent transmissions at all times of the day. Many of those exchanges involved, or pertained to, members of the conspiracy. The exchanges often relied upon coded or guarded language as the co-conspirators' communications evinced suspicion that their activity was being monitored, and they took collective measures to avoid apprehension.

In addition, as the investigation commenced, the extent of the conspiracy and its participants was largely unknown to the police. We have previously held that where the conduct being investigated involves "a course of conduct embracing multiple parties and extending over a long period of time . . . the initial plan may properly authorize interception of all communications during their entire durations." **Doty**, **supra** at 400. Indeed, "[t]his is especially so where coded or guarded language is used, or where information concerning the extent of a conspiracy, the identity of the

conspirators, and other details of the conspiracy are sought." *Id*. at 400-401. As such, continuous monitoring was warranted.

We also find that the intrinsic minimization procedures employed by the monitors were reasonable. Although the co-conspirators often communicated via text-message or short telephone conversations, their use of guarded or coded language hampered the monitors' ability to quickly and accurately assess the import of any particular communication. Hence, the two-minute listening window and spot-check procedure adequately balanced the investigative needs of the Commonwealth with the parties' right to privacy. This is especially true given the co-conspirators' attempts to shield themselves from suspicion, which required extensive investigative resources to burrow through.

Lastly, we find that the Commonwealth did not materially deviate from the wiretap order. The Commonwealth failed to properly minimize approximately three-and-one-half percent of the telephone conversations it intercepted. In a case like this, involving extensive communication between multiple parties employing coded language, the relevancy of any particular conversations was often not immediately apparent. Based on these practical difficulties, we do not find that the Commonwealth's deviation was so substantial as to justify exclusion of the contents and evidence derived from the wiretap investigation. Hence, the suppression court did not err in denying Appellant's motion to suppress.

Judgment of sentence affirmed.

*Judgment Entered.*

_____
*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/25/2017*