J-S20017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ELVA MARIE WARNER-CONFER | : | |
| | : | |
| Appellant | : | No. 1052 WDA 2018 |

Appeal from the Judgment of Sentence Entered July 2, 2018
In the Court of Common Pleas of Clarion County Criminal Division at
No(s):
CP-16-CR-0000328-2017

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED JUNE 19, 2019**

Elva Marie Warner-Confer appeals from the judgment of sentence entered following her jury-trial conviction for drug delivery resulting in death, delivery of a controlled substance, and possession with intent to deliver a controlled substance ("PWID").[1] Warner-Confer alleges the trial court abused its discretion when it permitted the Commonwealth to ask her on cross-examination whether she was addicted to Fentanyl. Because we agree with the trial court that Warner-Confer's testimony on direct examination opened the door to the cross-examination and that the evidence was more probative than prejudicial, we conclude the trial court did not abuse its discretion. We affirm.

_____

[1] 18 Pa.C.S.A. § 2506(A) and 35 P.S. §§ 780-113(A)(30), respectively.

On April 2, 2016, Donald Brown died of Fentanyl toxicity. N.T., 6/12/18, at 3, 50. Prior to his death, Warner-Confer delivered to Brown Fentanyl patches.

At trial, Warner-Confer testified in her own defense. She testified extensively on direct examination that she used Fentanyl patches to combat pain, but obtained them not with a prescription, but from a relative because she thought her doctor would not prescribe them. She also said she would put whole patches in her mouth and chew on them if she "wanted it," and would sometimes put the patches in pieces and chew on the pieces:

> Q. Now, I want to move on to talking about Ms. Best real quick. We heard testimony from Ms. Best that you had purchased Fentanyl patches from her?
>
> A. I have.
>
> Q. You admit you have purchased patches from her?
>
> A. Yes.
>
> Q. Her testimony was that you mentioned something about an accident and pain and something like that; is that an accurate statement from her?
>
> A. It is.
>
> Q. So you had an accident?
>
> A. I had a bad car accident.
>
> Q. When was that?
>
> A. 2001.
>
> Q. And you're not a doctor, so I want to ask you just of the symptoms that you experienced. What were the major problems as a part of this accident?
>
> A. The ones that I still have?

Q. Any of them.

A. I broke my neck in three places - the cervical 1, 2 and 3. Cervical 1 is replaced, so I have horrible pain halfway down my shoulder blades.

My shoulder blade on my right side had compound fractures. They came through my back causing awful pain.

I have a lot of nerve damage on my left side from that, the whole way to my foot. Sometimes it's so bad that it puts me down in bed for a day or two, I suppose.

And I had 17 fractures in my spine.

I ripped half of my left side of my face off. I ripped it clean down to the eye socket, and I spent 62 weeks that year trying to have skin grafts and plastic surgery trying to get it fixed to the point where it is now.

The left side of my jaw is still crooked.

Q. So as far as this accident, I mean, this is severe stuff. Were you - so you said the accident was in 2001?

A. Yes.

Q. By the time all of your medical treatments are done, do you remember, approximately, when this was?

A. 2006.

Q. So about five years total of on and off treatment?

A. Yes.

Q. During that time - you mentioned some of the pain you're dealing with, nerve pain and things like that, and it laid you up. Were there any other associated pains that you had as a result of that accident?

A. I still get horrible headaches. My neck causes me a lot of pain, front and back for some reason. My back aches bad in the lower lumbar region on and off, not constantly.

Q. What about the other pain?

A. It's off and on with the nerve damage. But when it comes back, it's bad.

- 3 -

Q. Just for the jury's purposes, when you say it's off, does that mean there's no pain at all?

A. No. It's never no pain at all. There's always an edge.

Q. So can you describe for the jury how exactly did it come to be that you were purchasing Fentanyl?

A. Aunt Lorraine said that she had gotten Fentanyl when she went to the doctor, and she asked me if I wanted one to try to see if it helped me. I mowed her yard and I tried it. That's what started it.

Q. Describing this pain, did it work?

A. Yeah. It worked real well.

Q. So we're talking you went from potentially debilitating pain to what?

A. Nothing.

Q. Like walking just fine? No issues? No headaches?

A. Nothing.

Q. Had you - the obvious question is, had you ever thought about going to a doctor to see about asking for better medication?

A. I had.

Q. Well, so you were taking other medication?

A. I was.

Q. And how was it in dealing your pain?

A. Sometimes it would take the edge off, at least, but it never worked like I thought they should; especially, the headaches. I tried so many different muscle relaxers.

Doctor Zlotnicki, he sent me to different specialists to have it checked and different medications to be administered. Nothing worked. I got sick with half of them. Rashes. I had a horrible reaction to medications.

Q. Well, I mean, did you try to ask for something stronger, for Fentanyl?

A. No.

Q. Why not?

A. I just didn't think he would give it to me. I figured the doctor - Dr. Zlotnicki is my doctor. I figured if I asked him for Fentanyl - I wasn't missing an appendage and I didn't have anything terminal, I just figured he would tell me no. And I figured I wouldn't even ask. He's been my doctor the entire time. He flew to Pittsburgh when I broke my neck.

Q. So you've been in his care for a number of years now?

A. Twenty-four, 25 years.

Q. Now, we heard testimony today that you would – that the practice, I guess, was sometimes you would either cut up the patch, and then the grand jury transcript said that you would almost do a whole path at once. So I'll ask you, is that accurate?

A. It just depended on how I was feeling or if I was in pain or what I was trying to do. It just depended on what day or how much I had.

Fentanyl is not easy to get. My aunt testified that she got ten a month. People that get those need them, for the most part. They're not going to sell five or six when they're missing a leg or anything.

Q. But we're asking about you right now.

A. I could only get one a month or maybe just two -

Q. I just need you to answer the question.

A. Well that's – I'm explaining.

Q. Okay. But my question was: Is it accurate that you would sometimes cut up the patches or take a whole one from time to time?

A. I would take a whole one from time to time. But if I didn't have many, I would cut them up. Does that make sense?

Q. Yeah. So I guess the question that the jury is probably thinking, I think it's a fair question, why would you put them in your mouth?

A. Because I get a rash, horrible rash. Like if I take the sticky off and stick it on my skin, I get a horrible rash. And if you stick them in your mouth and chew them, they bust open quicker.

Q. You couldn't deal with the rash?

A. No.

Q. What would you do?

A. I cut them. With the patches?

Q. What would you do if you started getting a rash?

A. Take it off.

Q. And then you just -

A. Peel the back off of it. If it was a big patch I would stick the whole patch in my mouth if I wanted it. If I didn't want it, I would peel the back off of it and cut it and stick it in my mouth and chew it.

N.T., 6/14/18, at 120-125.

On cross-examination of Warner-Confer, the prosecutor asked if she was addicted to Fentanyl:

Q. So, first of all, Miss [Warner-]Confer, you're not a doctor, correct?

A. No, sir, I am not.

Q. Okay. You are not a pharmacist?

A. No, sir.

Q. You have no license to dispense controlled substances; is that correct?

A. No, sir.

Q. Now would it be fair to say that during the time period we're talking about, to the death of Mr. Brown on April 2nd and the weeks leading up to that, you were addicted to Fentanyl, were you not?

*Id.* at 142. Defense counsel objected, and, at a side-bar, stated the questioning was "prejudicial" and beyond the scope of Warner-Confer's testimony on direct. The trial court overruled the objection:

> MR. SPESSARD: Your Honor, I object to that as being wholly prejudicial, giving the nature of the work we did with limiting the Grand Jury transcript. And as far as I'm aware, Miss Confer did not testify in a way that would open herself up to some sort of impeachment regarding addiction.
>
> MR. AARON: I think it's a fair question. She stated she's seeking Fentanyl, and she's seeking it for her pain. Then she bought it from Lorraine Best. And I believe it's a fair question, Your Honor, based on the situation.
>
> MR. SPESSARD: She never stated it was only for pain. In fact, I believe she equivocated a bit about what she may have purchased it for, but never in any way intimated that she was addicted. I don't think this is a fair question for impeachment purposes.
>
> MS. SHEEHAN-BALCHON: The redaction issue, the reason we redacted the transcript the way we did was because we could not predict what she was going to testify, so we sanitized it. She's testifying now.
>
> THE COURT: I appreciate that. I don't want to be unreasonable here, but we can't tag team on this. This is Mr. Aaron's time before the Court. We're not going to switch back and forth here. I think based on her testimony, her roundabout testimony, about why she didn't get a prescription for it, I think maybe it is a proper question. I'll allow it. Overruled.

*Id.* at 142-43. Following the side-bar, Warner-Confer testified that she was, in fact, addicted:

> Q. Miss Confer, is it not true that during the weeks immediately leading up to the death of Mr. Brown, which occurred on April 2nd, that you were a Fentanyl addict?
>
> A. I wasn't real bad until after.

Q. Sorry?

A. Honestly, it wasn't real bad until afterwards.

Q. So it got worse after?

A. Way worse.

Q. Worse after he died?

A. Yes, sir.

Q. But this addiction existed before he died?

A. I suppose you could say that.

*Id.* at 144.

The jury found Warner-Confer guilty of drug delivery resulting in death, delivery of a controlled substance, and PWID. In June 2018, the trial court sentenced Warner-Confer to 108 to 216 months' incarceration for the drug delivery resulting in death conviction. The delivery of a controlled substance and PWID convictions merged with the drug delivery resulting in death conviction for sentencing purposes. Warner-Confer filed a Notice of Appeal.

On appeal, Warner-Confer raises the following issue: "Did the trial court err in permitting testimony regarding [Warner-Confer's] history of abusing Fentanyl because such testimony was irrelevant, or if relevant, the probative value thereof was outweighed by the risk of undue prejudice?" Warner-Confer's Br. at 4.

We review a trial court's ruling as to the admission of evidence for an abuse of discretion. **Commonwealth v. Poplawski**, 130 A.3d 697, 716 (Pa. 2015); **Commonwealth v. Murphy**, 182 A.3d 1002, 1004 (Pa.Super. 2018) (quoting **Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015)). "An

abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Poplawski*, 130 A.3d at 716 (quoting *Commonwealth v. Sherwood*, 982 A.2d 483, 495 (Pa. 2009)).

"[E]vidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." *Commonwealth v. Powell*, 171 A.3d 294, 299 (Pa.Super. 2017) (quoting *Commonwealth v. Hicks*, 156 A.3d 1114, 1125 (Pa. 2017)); Pa.R.E. 404(b). Evidence that might otherwise be inadmissible, such as evidence of prior bad acts, may be introduced where a defendant "opens the door . . . by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." *Id.* (quoting *Commonwealth v. Nypaver*, 69 A.3d 708, 716 (Pa.Super. 2013)); *see* Pa.R.E. 607(b) ("The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules."). Further, "trial judges retain wide latitude as to the scope of cross-examination and will not be reversed absent an abuse of that discretion." *Murphy*, 182 A.3d at 1005.

The trial court determined that the Commonwealth could question Warner-Confer as to whether she was addicted to Fentanyl to counter her testimony on direct examination that she used Fentanyl to address her pain. Trial Court Opinion, filed Sept. 26, 2018, at 5. The trial court further found

that the probative value of the evidence outweighed its potential for unfair prejudice. *Id.* at 6. The court noted the following:

> [Warner-Confer] testified that she did not get the Fentanyl through her physician, but illegally from someone who had a prescription. She also admitted that she did not use the medicine as intended by applying the patch to her back to allow the medicine to be time released, but instead tore or cut the patches apart and ate the capsules. Given these admissions it would not be unusual for the trier of fact to be considering that there was a reason other than pain prompting the drug use. Given the information that [Warner-Confer] had given the jury through her own direct testimony it would not be shocking nor surprising to learn that she was addicted.

*Id.*

The trial court did not abuse its discretion in determining that Warner-Confer's direct testimony, which discussed her use of illegally-obtained Fentanyl for pain, opened the door to a question regarding addiction on cross-examination. Further, in light of her testimony on direct examination, including her testimony that she obtained Fentanyl illegally and that she at times used the drug by chewing on the patches, rather than putting them on her skin, it was not an abuse of discretion to conclude that the probative value of the evidence outweighed any unfair prejudice.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/19/2019